PARTNERS IN CHARITY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1701–11X.          Filed August 26, 2013.

P was established as a nonprofit corporation under the laws of Illinois. P applied for recognition of tax-exempt status, explaining that its primary activity was to provide down-payment assistance grants to home buyers. R determined that P was a charitable organization described in I.R.C. sec. 501(c)(3). In actual operation, P required each home seller to pay to P the down-payment amount along with a fee. R retroactively revoked his determination, and P filed for a declaratory judgment under I.R.C. sec. 7428. *Held*: P's down-payment assistance program was not operated for a charitable purpose, and P engaged in substantial commercial activities that did not further an exempt purpose. Therefore, P is not an organization described in I.R.C. sec. 501(c)(3). *Held, further*, R did not abuse his discretion in making his adverse determination retroactive to the date of P's incorporation.

*Alvin S. Brown*, for petitioner.
*Mark A. Weiner*, for respondent.

GUSTAFSON, *Judge*: After examining the activities of petitioner, Partners In Charity, Inc. ("PIC"), for the years 2002 and 2003, the Internal Revenue Service ("IRS") issued to PIC a final adverse determination letter dated October 22, 2010, revoking its recognition of PIC's tax-exempt status. The revocation was retroactively effective to the date of PIC's incorporation on July 10, 2000. On January 20, 2011, PIC timely petitioned this Court pursuant to section 7428[1] and Rule 210, seeking a declaratory judgment that PIC was an organization described in section 501(c)(3) during 2002 and 2003 (the examination years) and that the IRS's revocation of PIC's tax-exempt status be declared null and void.

The issues for decision are: (1) whether during the examination years PIC was operated exclusively for a charitable purpose (we hold that it was not); and (2) whether, in retroactively revoking its determination that PIC was an organization described in section 501(c)(3), the IRS abused its discretion (we hold that it did not).

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.), and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The administrative record underlying the IRS's adverse determination was filed with the Court in accordance with Rule 217, and a subsequent trial was conducted in Washington, D.C. The parties stipulated some of the facts.

*PIC's formation*

Before creating PIC, Charles Konkus was a real estate developer in the Chicago area, focusing his business ventures on developments for medium- to high-income consumers. Mr. Konkus observed that home ownership was becoming more difficult for low-income individuals, and he decided to create a means for helping home buyers. Mr. Konkus incorporated PIC as an Illinois not-for-profit corporation on July 10, 2000. Mr. Konkus served as PIC's executive director, devoting 40 hours a week to the job and receiving no direct compensation in return. In addition to Mr. Konkus, PIC had two other individuals on its board of directors—Katy Motlagh and Jeanne Weaver—but they devoted virtually no time to their positions with PIC. Mr. Konkus exercised unchecked control over PIC's operations and finances.

*PIC's application for recognition of tax-exempt status*

In July 2000 PIC submitted to the IRS Form 1023, "Application For Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code", on which PIC reported:

> Partners In Charity will provide down payment assistance program for low income individuals and families to allow individuals who could not otherwise do so to own their own home. Partners in Charity [sic] will also engage in other affordable housing efforts, using excess contributions to develop low-income apartments for seniors and families, the acquisition and rehabilitation of single-family homes, and contributions to other housing related charitable organizations such as faith based charities, community based charities and national charities such as Habitat for Humanity.

In response to a question regarding PIC's expected sources of financial support PIC reported on Form 1023: "Partners in Charity [sic] will solicit gifts from corporations, foundations, and individuals with whom the members, directors and officers have personal relationships." In addition PIC reported

that it expected to receive "gifts, grants, and contributions" of $100,000 during 2002 and $150,000 during 2003, and that it expected to pay "contributions, gifts, grants and similar amounts" of $80,000 and $120,000 during 2002 and 2003.

On October 2, 2000, the IRS asked PIC to provide assurances (1) that PIC would serve a charitable class (mentioning the safe harbor guidelines in Rev. Proc. 96–32, 1996–1 C.B. 717) and (2) that no private interests of individuals with a financial stake in the project would be furthered. On October 9, 2000, PIC submitted to the IRS a "Statement of Policy" signed by Mr. Konkus as "President/Treasurer/Director" of PIC, which stated:

> Partners In Charity, Inc. has adopted a policy to comply with the low income housing safe harbor guidelines in that at least 75% of units for a given project will be made available for families earning 60% or less of the area's median income as adjusted for family size. The remaining 25% of the units for a given project will be made available to persons on the lower end of the economic spectrum who may not necessarily be members of a charitable class.
>
> The Directors and Officers in Partners In Charity, Inc. are not real estate developers, property managers or owners of significant parcels of undeveloped lands. Partners In Charity, Inc. intends to have a community-based Board of Directors once it established a track record and can attract qualified community-based individuals to serve.

### The IRS's prior determination

On November 9, 2000, the IRS ruled favorably on PIC's application and issued to PIC a determination letter that stated: "[B]ased on information you supplied, and assuming your operations will be as stated in your application for recognition of exemption, we have determined you are exempt from federal income tax under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3)." This determination was effective as of PIC's incorporation date, July 10, 2000.

### The DPA program

As its title suggests, PIC's "down payment assistance" ("DPA") program provided home buyers with funds to use for down payments for home purchases. However, it obtained those funds (along with a fee) from home sellers; and in only two-tenths of 1% of its transactions did PIC make a DPA grant where the seller was not reimbursing the down pay-

ment and PIC's fee. A seller's payment to PIC equaled the down payment amount that PIC gave to the buyer plus PIC's fee—i.e., either 0.75% of the final sale price or, in the case of a professional home builder, $500.

PIC created and used a document entitled "Gift Letter and Grant Application" to effect its agreements with buyers and created and used a "Seller Participation Agreement" for agreements between itself and sellers. In addition to those documents, PIC collected the following information: the property's address; the buyer's annual income; the buyer's gender and ethnicity; the name of the loan originator and lending institution; the type of loan the buyer intended to use; a copy of the purchase contract; a copy of the first two pages of the appraisal report; and copy of the settlement statement (HUD–1). Much of this information appeared on a form called the "Gift Funds Request" form, which was created by PIC and filled out by the buyer's lender.

### "Seller Participation Agreement"

PIC induced a prospective seller to sign a "Seller Participation Agreement". This agreement provided that a seller's property would qualify as a "Participating Home" in PIC's program if the seller (a) agreed to accept the buyer's terms for financing (using an eligible loan program that accepted charitable gifts from non-profit organizations) and (b) delivered the real estate purchase contract to a PIC-approved escrow officer or closing agent. The Seller Participation Agreement further provides:

> PIC agrees to assist in the dissemination of pre-qualification information to prospective homebuyers, including the PIC home buying guide, and to utilize the PIC Program to provide home ownership education and down payment assistance to qualified homebuyers, any one of which may elect to purchase the Participating Home. *In consideration of the foregoing*, Seller agrees to make a contribution to PIC in the amount of * * * [the down payment amount plus a fee of 0.75% of the purchase price] within (2) business days from the transfer of the Participating Home to the Buyer. [Emphasis added.]

The Seller Participation Agreement states: "[T]he [seller's] contribution will not be used to provide down payment assistance to the Buyer of the [seller's] Participating Home." Instead, to fund the current buyer's DPA grant, PIC used money it had acquired from previous sellers' contributions.

PIC would then use the current seller's payments to fund future grants and to cover PIC's operating expenses.[2] A seller was obligated to make a contribution to PIC only "if a homebuyer utilizing the PIC Program purchases the [seller's] Participating Home".

*"Gift Letter and Grant Application"*

A buyer requested PIC funding by submitting to PIC a signed "Gift Letter and Grant Application", which stated in part:

> Once Partners In Charity, Inc., a non-profit organization, has received the following:
>
>> 1. A signed copy of this form.
>> 2. A copy of the Seller Participation Agreement.
>> 3. The lender's request for gift funds.
>> 4. Copy of Appraisal (First 2 pages only)
>> 5. Copy of Purchase and Sale Agreement
>> 6. Closing Office Wire Instructions
>
> PIC will wire Gift Funds to the closing office, in the amount of * * * [the down payment] to assist you in the purchase of your new home.

The terms of the grant application are consistent with PIC's practices that its payment of a DPA grant was subject to the condition precedent that PIC receive a "Seller Participation Agreement", pursuant to which the seller agreed to contribute to PIC the grant amount plus a fee if a home buyer using the PIC program purchased the seller's house.

If the buyer was unsuccessful in obtaining a loan (or if the lender did not actually provide the loan proceeds shortly after PIC's funds were received by the closing office), then the buyer agreed that the escrow agent would return the down payment funds to PIC. If the purchase transaction concluded successfully, then the buyer was under no obligation to repay the DPA grant to PIC.

*The flow of funds at closing*

The record contains several HUD–1 settlement statements for transactions in which PIC participated. The HUD–1 lists PIC's DPA grant as an "amount paid by or on behalf of bor-

[2] PIC also donated a small portion of each seller's contribution to other charitable organizations.

rower", and it lists the seller's contribution and fee to PIC as a "reduction in amount due to the seller". An escrow agent generally transferred the seller's payments to PIC at closing or shortly thereafter. Thus, the essence of the arrangement was that the buyer was excused from having to come up with the money to make a down payment; and the down payment was instead indirectly paid by the seller[3] out of the sales proceeds that were provided by the lender.

*The buyers' incomes*

Although PIC collected information about grantee buyers' annual incomes and ethnicities, PIC did not use this or any other information to assure that a grantee was a member of the class described in the policy statement ("families earning 60% or less of the area's median income as adjusted for family size") that PIC provided when the IRS was considering its application. PIC did not collect any information concerning the buyer's marital or parental status (and so could not know "family size"). PIC made the DPA program available indiscriminately to a broad range of buyers, not just those with low incomes or in under-served populations.[4] Mr. Konkus testified at trial about an example of an $85,000 home ("certainly a modest house, Your Honor") that was financed by a loan from the Federal Housing Authority ("FHA")[5] that required a down payment of 3%—calling for

---

[3] As we noted above, the seller's contribution did not directly fund the down payment in his own transaction, which came instead from funds advanced to the escrow agent by PIC. However, since 99.8% of the sellers participating in the PIC DPA program "contributed" at closing an amount equal to the down payment plus PIC's fee, it is clear that a given seller indirectly provided the down payment for his own transaction.

[4] One of PIC's fliers advertised: "If you can get the mortgage, we'll give you the down payment. It's extremely easy to receive your FREE gift from PIC. In fact, there is only one requirement you must meet. You must qualify for any eligible loan program with your lender. Don't worry; they have many programs to meet your needs." Another flyer advertised: "No Income, Asset or First Time Buyer Restrictions".

[5] Congress created the FHA through the National Housing Act of 1934, ch. 847, sec. 2, 48 Stat. at 1246 (codified as amended at 12 U.S.C. sec. 1709 (2006)). FHA was established primarily for the purpose of insuring mortgage lenders against default by borrowers. *Id.* sec. 1709(b)(9). Before FHA can insure a single-family home mortgage, the loan must meet certain eligibility requirements set forth in the National Housing Act. 12 U.S.C. sec. 1709. One of these eligibility requirements involves the 3% down payment

PIC to make a DPA grant of $2,550. However, throughout 2002 and 2003 almost 600 of PIC's DPA grants exceeded $10,000; and PIC made at least two DPA grants of $100,000 or more to assist buyers purchasing property priced over $1 million.

PIC also collected information about buyers' financing arrangements. In most cases buyers using PIC's DPA program obtained FHA loans. This fact, however, does not show that the PIC buyers are members of a charitable class. Contrary to Mr. Konkus's assertions, there does not appear to have been a maximum income level that would have disqualified a borrower from receiving an FHA loan; rather, the only limitations on FHA loans appear to have been related to a borrower's credit-worthiness and the value of the purchased house.[6] In addition, PIC did not limit its program to buyers who used FHA financing. Any financing (including conventional mortgages) was permissible.

*Payment by and benefits to sellers*

PIC advertised that its DPA program financially benefited sellers by: (1) providing sellers with ready buyers, (2) enabling the sellers to sell for higher prices,[7] and (3) allowing them to sell faster because of the larger pool of

---

of the home's acquisition cost. *Id.* sec. 1709(b)(9).

[6] *See* 12 U.S.C. sec. 1709; 24 C.F.R. secs. 203.17–203.26 (2012) (Mortgage provisions). PIC points to no specific rule, regulation, or guideline that restricts FHA loans to the poor.

[7] Several of PIC's promotional materials claimed that PIC's DPA program generally increased sellers' net proceeds. One particular flyer listed step-by-step instructions for sellers; and, after stating that sellers were required to pay PIC the down payment amount and a fee, the flyer stated:

To make the transaction fair for you, the buyer will most likely offer full value on your property. This benefits you dramatically. To illustrate this, you need to know that on average, sellers take a reduction in the price to sales price of 5–7%. This means that a home listed at $100,000 would normally sell for $93,000 to $95,000 if the buyer didn't use the PIC Program. If they use the program, you will most likely sell your home for the list price of $100,000 and contribute $3,000 of the downpayment plus a fee of only .75% of the sales price to PIC. This means you'll net $96,250 instead of $93,000-$95,000.

*That's $1,250-$3,250 MORE FOR USING PIC! We're Helping You PIC Your Future!*

potential buyers.[8] Consistent with the language in the "Seller Participation Agreement" that PIC's benefits to sellers were "in consideration for" sellers' contributions and fees, we find that in PIC's transactions with sellers, the seller paid PIC a fee for a service. PIC received virtually all of its funding from payments by sellers for the services it provided to them; and when considered in combination with PIC's marketing strategy, commission-like fee structures, and significant revenues, we find that PIC's commercial activity with sellers was a substantial part of PIC's operation. This commercial activity was in fact PIC's primary purpose.

*PIC's other activities*

In conjunction with the DPA program, PIC educated potential buyers about purchasing a home and about various responsibilities associated with home ownership. The educational materials provided by PIC also helped buyers to develop action plans for buying a home. PIC's educational programs were evidently informative and, we assume, beneficial to prospective home buyers. However, we find that providing education to home buyers was neither PIC's exclusive nor its primary purpose.

PIC contends that by requiring a copy of an FHA appraisal report before making a DPA grant, it assured that prospective houses were habitable, clean, and decent properties suitable for low-income buyers. In addition, PIC alleges that it examined HUD–1 settlement statements to assure that buyers were not paying inappropriate fees. Collecting the appraisal report and the HUD–1 might have provided PIC with information that, if examined carefully, might have helped enable it to protect buyers from uninhabitable or unsafe property or inappropriate lender fees; but we find that PIC did not use information from the appraisal reports

---

[8] Another PIC flyer that was directed to sellers and builders stated:

Participating in the PIC program opens up the seller's market by 30–40% because more buyers qualify. * * * There are no restrictions, like many bond or local affordable housing programs: NO First Time Homebuyer Requirements; NO Income Asset Restrictions; NO Recapture Clauses (the borrower never needs to pay it back); NO Reserved Required; NO Geographic Boundaries; Use With Any Program.

and the HUD–1 statements for these purposes. PIC requested only the first two pages of appraisal reports, and this limited excerpt would not provide adequate information for evaluating the habitability of a house. For instance, information about adverse environmental conditions that the property might have (e.g., lead-based paint) or repairs that the property might need would often be omitted from those two pages or would be discussed in an addendum or additional comments to the appraisal report not provided to or examined by PIC. PIC did not require or request a home inspection report on a house before making a DPA grant. In addition, PIC received the HUD–1 only after the purchase was already completed, and any review of lender fees reported on the HUD–1 would have come too late to provide any benefit to buyers. PIC thus did not protect buyers from hazardous fees or uninhabitable properties.

With regard to "other affordable housing efforts" mentioned in PIC's Form 1023, PIC's financial statements indicate that PIC lent $513,478 to "Partners in Charity Marketing", which Mr. Konkus owned and which in 2003 he renamed "Restoration America"; but we cannot tell from the record how these funds were used nor whether the loan had a charitable purpose. PIC did not persuade us that excess PIC funds were used to develop low-income apartments for seniors and families or to acquire and rehabilitate single-family homes for low-income individuals.

*PIC's finances*

PIC's income and expenditures greatly exceeded the expectations it reported on its Form 1023. According to annual financial reports, PIC received payments from home sellers participating in the DPA program totaling $28,644,173 in 2002 and $32,439,723 in 2003. Revenues from home sellers were PIC's primary source of income in 2002 and 2003,[9] and PIC did not receive any charitable contributions, gifts, or grants in those years.

In 2002 PIC made 5,743 DPA grants totaling $25,206,041. Similarly, in 2003 PIC made 5,704 DPA grants totaling $29,058,724.

---

[9] PIC also reported revenue from interest on cash investments, dividends, and gain from the sales of securities.

Apart from its DPA grant obligations, PIC incurred expenses in 2002 totaling $1,641,125. Of this amount $564,933 was for marketing expenses paid to Royale Dynamics, Inc. (RDI), a company (discussed below) that was wholly owned by Mr. Konkus's wife. Similarly, in 2003 PIC incurred expenses totaling $2,266,831, which included $580,234 paid to RDI. Apart from DPA grants, PIC's aggregate payments to RDI accounted for its largest expenditures in both 2002 and 2003.

By the end of 2003, PIC had accumulated unrestricted net assets totaling $3,592,271.

*Royale Dynamics, Inc.*

RDI is a for-profit Illinois corporation, wholly owned by Mr. Konkus's wife, Tammy Butler. RDI was created in 1983, and by 2001 Ms. Butler had developed experience marketing in the mortgage industry. Mr. Konkus decided to use his wife's company to promote PIC's DPA program to lenders who offered mortgage products to low-income borrowers most likely to benefit from PIC's services. In 2001 PIC entered into an exclusive marketing agreement with RDI, under which RDI would design all marketing, Web site, and advertising materials, and would promote the PIC Program in the mortgage and real estate industry. PIC's contracts with RDI stated that RDI's objective was to enable PIC to "close the highest possible number of [t]ransactions" and "quickly obtain market share and a national presence in the delivery of the PIC program services". To this end, RDI created materials marketing the PIC program to buyers, sellers, and home builders, as well as marketing materials and sales technique training for real estate agents and lenders, to help them generate business and close transactions.

In exchange for its service obligations, RDI was to receive 30% of PIC's fees generated from each transaction that used a PIC DPA grant, subject to the following limitations: RDI's annual compensation could not exceed $567,000 in 2002 and $581,000 in 2003. RDI's compensation from PIC was similar to that of other firms in the DPA industry. PIC provided substantially all of RDI's revenue in 2002 and 2003.

*IRS's revocation*

The IRS examined PIC's activities during the years 2002 and 2003, and on October 22, 2010, the IRS issued a final adverse determination, revoking its recognition of PIC's tax-exempt status. The IRS concluded that PIC did not operate exclusively for an exempt purpose, as required under section 501(c)(3). The IRS's conclusion was based on its findings that: (1) PIC's net earnings inured to the benefit of private individuals or shareholders; (2) more than an insubstantial part of PIC's activities was not in furtherance of an exempt purpose; (3) PIC operated for the benefit of private interests; and (4) PIC operated for the primary purpose of carrying on an unrelated trade or business.

The final adverse determination letter states in a header that the applicable tax years are "12/31/02 and subsequent"; however, the text states that the IRS made its adverse determination retroactive to PIC's incorporation date, July 10, 2000.

OPINION

I. *Procedural issues*

Section 7428(a) confers jurisdiction on the Tax Court "[i]n a case of actual controversy" to "make a declaration" with respect to an organization's "continuing qualification" as an organization described section 501(c)(3) that is exempt from tax under section 501(a). For purposes of section 7428, "a determination with respect to continuing qualification * * * includes any revocation of or other change in a qualification". Sec. 7428(a).

The parties have tried this case under Rule 217(a), which provides: "Disposition of an action for declaratory judgment involving a revocation * * * may be made on the basis of the administrative record alone *only* where the parties agree that such record contains all the relevant facts and that such facts are not in dispute." (Emphasis added.) Since PIC does not agree that the administrative record contains all the relevant facts, we do not limit the evidence to that which is contained in the administrative record. Furthermore, Rule 217(b) provides that, in an action involving a revocation, "the

Court may, upon the basis of the evidence presented, make findings of fact which differ from the administrative record."

The parties did not address the standard of review that we should apply, although both implicitly tried it under a de novo standard, with the Commissioner free to make new arguments at trial. *See* H.R. Rept. No. 94–658, at 285 (1976), 1976–3 C.B. (Vol. 2) 977 ("The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new argument which the Service may wish to introduce at the time of the trial"); *cf. IHC Health Plans, Inc. v. Commissioner*, T.C. Memo. 2001–246, 2001 WL 1103284, at *11, *aff'd*, 325 F.3d 1188 (10th Cir. 2003).

In these circumstances, the burden of proof rests on the petitioner to demonstrate that the IRS's determination was incorrect. Rule 142(a);[10] *Rameses Sch. of San Antonio, Tex. v. Commissioner*, T.C. Memo. 2007–85. PIC's pretrial memorandum contends that the burden should shift to the Commissioner pursuant to section 7491. The Commissioner argues that section 7491 does not apply in a declaratory judgment action brought under section 7428. Because we determine by the preponderance of the evidence the facts in this case that relate to the revocation of petitioner's exemption ruling, we need not determine whether the burden of proof on the issue of tax-exempt status has shifted. *See Martin Ice Cream Co. v. Commissioner*, 110 T.C. 189, 210 n.16 (1998).

On the issue of the retroactivity of the IRS's adverse determination, our standard of review is different. Section 7805(b)(8) provides that "[t]he Secretary [of the Treasury] may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal

---

[10] Under the pre-2003 Rule 217, the petitioner in a declaratory judgment action bore the burden of proof with regard to reasons offered in the determination (or revocation) letter, and the Commissioner bore the burden of proof with any new reasons. Rule 217(c), 109 T.C. 661. However, in 2003 we amended Rule 217, deleting paragraph (c) because we did "not wish to suggest by Rule that * * * section [7491] does not apply [to declaratory judgment actions]". Rule 217 note, 120 T.C. 641. Thus, we assume the general rules in Rule 142(a) apply in this declaratory judgment action.

revenue laws shall be applied without retroactive effect." Pursuant to this authority the Secretary has given the IRS discretion to retroactively revoke exemption rulings or determination letters where "the organization omitted or misstated a material fact, [or] operated in a manner materially different from that originally represented". 26 C.F.R. sec. 601.201(n)(6)(i), Statement of Procedural Rules. A retroactive revocation of a tax-exemption ruling will not be disturbed in the absence of an abuse of discretion, *Auto. Club v. Commissioner*, 353 U.S. 180, 184 (1957), and we therefore review that retroactive determination for abuse of discretion.

II. *Section 501(c)(3)*

A. *In general*

In order to be described in section 501(c)(3), an organization must be both "organized and operated exclusively[11] for" certain specified exempt "purposes", which include religious, charitable, educational, and scientific purposes. Sec. 501(c)(3); *Am. Campaign Acad. v. Commissioner*, 92 T.C. at 1062–1063. The Commissioner does not dispute that PIC is *organized* exclusively for exempt purposes (since PIC's organizing documents do not fail to so state), *see* 26 C.F.R. sec. 1.501(c)(3)–1(b), Income Tax Regs., but instead maintains that PIC failed to *operate* exclusively for exempt purposes (a requirement that calls for an examination of PIC's actual operations).

Determining whether an organization pursues an exempt *purpose* requires more than a superficial observation of its *activities*. *B.S.W. Grp., Inc. v. Commissioner*, 70 T.C. 352, 356–357 (1978) ("the purpose towards which an organization's activities are directed, and not the nature of the activi-

---

[11] 26 C.F.R. section 1.501(c)(3)–1(c)(1), Income Tax Regs., provides: "An organization will be regarded as operated *exclusively* for one or more exempt purposes only if it engages *primarily* in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if *more than an insubstantial* part of its activities is not in furtherance of an exempt purpose." (Emphasis added.) That is, under the statute the exempt purposes must be "exclusive", but the regulation provides that an organization may be tax exempt even if its operations include activities in furtherance of *non*-exempt purposes, provided that those activities are "insubstantial". PIC's non-exempt purposes (and associated activities) are very substantial.

ties themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization"). Research may further an exempt scientific purpose, but the same research undertaken in a different context may be part of a taxable business. *See, e.g.*, *Jockey Club v. Helvering*, 76 F.2d 597, 597–598 (2d Cir. 1935), *aff'g* 30 B.T.A. 670 (1934). Distributing religious literature may further an exempt religious purpose, or in a different context it may be part of a taxable enterprise. *Scripture Press Found. v. United States*, 285 F.2d 800 (Ct. Cl. 1961). Teaching may further an exempt educational purpose, but the same sort of teaching undertaken in a different context may be part of a taxable, for-profit enterprise. *See, e.g.*, *Underwriters' Labs. v. Commissioner*, 135 F.2d 371, 373–374 (7th Cir. 1943), *aff'g* 46 B.T.A. 464 (1942); *Rameses Sch. of San Antonio, Tex. v. Commissioner*, T.C. Memo. 2007–85. One may feed the hungry in a soup kitchen or in a four-star restaurant; one may heal the sick in a Third-World clinic or in a lucrative medical practice; one may build a chapel in apostolic poverty with St. Francis or in a construction business. Likewise, one may contribute down payments in order to house the homeless poor, or in order to facilitate a commercial real estate business. Even in a commercial, profit-motivated context, such activities may be wholesome and commendable; but they will not support tax-exempt status unless they are undertaken to further an exempt purpose.

Moreover, the requisite "purpose" does not consist simply of a charitable motive (i.e., a desire that charitable benefit ultimately result from one's activities). Someone's main subjective motive for engaging in an activity may be, for example, religious, but his religious organization will be tax exempt only if the organization is operated to accomplish a religious purpose. In *Scripture Press Found.*, 285 F.2d at 804, an organization that published and sold Sunday School materials was held not exempt, notwithstanding the sincere religious motives of its principals:

> We think that plaintiff's assertion that its instructional activities are more important to plaintiff than its selling activities is entirely sincere. The evidence in this case * * * shows that throughout its history Scripture Press has been led by people of devout and intense religious conviction. However, the intensity of the religious convictions of the plaintiff's members and officers cannot operate to exempt them from the tax law

if the activities of the plaintiff cannot in themselves justify such an exemption. * * *

Likewise, a founder's subjective motive to educate poor people or facilitate their housing will not support tax-exempt status for his organization if it is not actually operated to accomplish a tax-exempt purpose.

To determine PIC's "purpose" within the meaning of section 501(c)(3), we therefore examine not Mr. Konkus's subjective motives but PIC's activities in their context.

### B. *Charitable class*

PIC contends that it operated to serve charitable purposes by providing to low-income individuals both DPA grants and financial counseling seminars and other educational programs designed to prepare potential home buyers for the responsibility of home ownership. PIC made over 5,700 grants in both 2002 and 2003 (about 16 a day) totaling over $25 million per year. Of its proffered activities, PIC's DPA program was certainly its primary activity during 2002 and 2003, with the educational programs either secondary or supplemental to the DPA program. The Commissioner argues that PIC's DPA program was not operated to achieve a charitable purpose. Accordingly, our first inquiry is whether PIC's DPA program served a charitable purpose.

The term "charitable" for purposes of section 501(c)(3) includes: (1) relief of poverty; (2) advancement of education or science; (3) advancement of religion; and (4) other purposes that are beneficial to the public or the community at large. 26 C.F.R. sec. 1.501(c)(3)–1(d)(2); *see also Columbia Park & Recreation Ass'n, Inc. v. Commissioner*, 88 T.C. 1, 18–21 (1987), *aff'd without published opinion*, 838 F.2d 465 (4th Cir. 1988). It would be possible to provide home-purchase down payment grants in such a manner that they further charitable purposes, *see* Rev. Rul. 2006–27, 2006–1 C.B. 915; but merely inducing home sellers to pay a fee and to provide funds for home buyers' down payments does not establish a charitable purpose. For the purpose of the program to be charitable, the recipients of the down payment grants must be members of a charitable class so that their receipt of the

grants helps to relieve the poor and distressed [12]—or furthers some other charitable purpose. *See Am. Campaign Acad. v. Commissioner*, 92 T.C. at 1076–1077. PIC's grants were not targeted to a charitable class.

PIC contends that it relieved the poor and distressed by following the guidelines set forth in Rev. Proc. 96–32, 1996–1 C.B. 717. That revenue procedure describes a situation involving organizations that provide low-income housing assistance that the IRS considers to be "charitable", because the organizations "relieve the poor and distressed". The revenue procedure's first requirement is that—

> [t]he organization establishes for each project that (a) at least 75 percent of the units are occupied by residents that qualify as low-income; and (b) either at least 20 percent of the units are occupied by residents that also meet the very low-income limit for the area or 40 percent of the units are occupied by residents that also do not exceed 120 percent of the area's very low-income limit. Up to 25 percent of the units may be provided at market rates to persons who have incomes in excess of the low-income limit. [*Id.* sec. 3.01(1), 1996–1 C.B. at 717.]

The Commissioner does not dispute that an organization like PIC, which provides down payment assistance, could rely on Rev. Proc. 96–32, *supra*; but the Commissioner argues that PIC fails to satisfy the requirements set out therein. While PIC ostensibly adopted a policy similar to the requirement of Rev. Proc. 96–32, *supra*, quoted above, PIC's policy was only nominal. PIC did not implement any internal controls to assure that it accomplished its stated policy. To the contrary, PIC offered its DPA grants to anyone who qualified for a mortgage and requested down payment assistance, and there were no income limits.

PIC argues that in fact it served low-income individuals, pointing to PIC's requirement that grant recipients report

---

[12] Relying on Government Accountability Office Publication No. 06–24, "Mortgage Financing, Additional Action Needed To Manage Risks of FHA-Insured Loans With Down Payment Assistance" (November 2005), the Commissioner alternatively contends that seller-funded down payment assistance programs do not actually benefit buyers. PIC's literature indicates that its "contribution" of the down payment discourages the buyers from negotiating the price and consequently results in substantially higher sale prices—thus possibly causing a net reduction in the amount of equity that the typical buyer has in the house. However, since we find other bases for our holding that PIC did not operate exclusively for charitable purposes, we do not reach this alternative argument.

their annual income. PIC argues that examination of those income figures indicates that grant recipients were in fact low-income individuals. PIC also cites the fact that almost all of its grant recipients qualified for FHA loans. These arguments fail for two reasons:

First, merely establishing after the fact that grant recipients generally had low incomes, when the program indiscriminately offered the grants to anyone who wanted them, does not establish that the organization was operated for an exempt *purpose*. As we noted above, the key factor for exemption under section 501(c)(3) is the purpose of the activity and not the nature of the activity. *B.S.W. Grp., Inc. v. Commissioner*, 70 T.C. at 356–357. PIC's assertions, if true, might enable one to say that the PIC's activities had a charitable *effect*, which would be commendable; but such an effect does not alone warrant tax-exempt status under section 501. While evidence of an organization's effect is often indicative of the organization's purpose, the effect per se may not carry the day (as the founders of Scripture Press learned when the religious effects of their publications did not result in tax-exempt status, *Scripture Press Found.*, 285 F.2d at 805–806).

Second, PIC's evidence does not establish that in fact its grants went to persons with low incomes. PIC did not use grantees' income and family size as qualification criteria in its grant approval process (though it represented to the IRS that it would do so). Rather, PIC approved grants without regard to grantees' incomes. Moreover, PIC did not provide any analysis or statistics that would support a finding: (1) that its grantees were poor, distressed, or underprivileged or (2) that providing down payment assistance to them would constitute relief to such classes. *See* 26 C.F.R. sec. 1.501(c)(3)–1(d)(2). PIC merely asserts, without evidence, that it served "low and moderate income buyers".

Similarly, showing that many PIC grantees had been approved for FHA loans does not establish that PIC operated to relieve poverty. As we noted above, there do not appear to have been any income limitations that would have prevented upper-income individuals from qualifying for an FHA loan. More important, even if FHA rules did restrict FHA loans to individuals with low incomes, PIC did not limit its program to buyers that used FHA financing. Rather, PIC's DPA

grants were available to individuals with any type of financing, not just financing often used by low-income buyers.

Indiscriminately giving money away to anyone who will take it is not a charitable purpose, even if some of the recipients are poor people. Section 501(c)(3) requires more; it requires that the money be given away in such a way that it furthers a *purpose* of reducing poverty, promoting education, science, or religion, or promoting another public good. We conclude that, during 2002 and 2003, PIC's DPA program did not operate for a charitable purpose.

### C. *Commerciality*

During the examination years, PIC engaged in two overlapping but distinct forms of activities: (1) activities that ultimately benefited the buyers (e.g., DPA grants and home owner education) and (2) activities that ultimately benefited the sellers (e.g., providing ready buyers, and promoting faster sales at generally higher prices). PIC's transactions with sellers generated significant revenues (over $28 million in 2002 and $32 million in 2003) and were clearly substantial. Even assuming, arguendo, that PIC's buyer-benefiting activities served an exempt purpose, PIC's seller-benefiting activities failed to further an exempt purpose and defeat the contention that PIC was operated exclusively for a charitable purpose. *See Better Bus. Bureau of Wash., D.C. v. United States*, 326 U.S. 279, 283 (1945) ("the presence of a single * * * [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes").

An organization is not necessarily disqualified from tax-exempt status solely because it generates fees in exchange for goods or services, or because it conducts a business. However, if an organization conducts activity "with an apparently commercial character as its primary activity, 'that fact weighs heavily against exemption.'" *Living Faith, Inc. v. Commissioner*, 950 F.2d 365, 373 (7th Cir. 1991) (quoting *B.S.W. Grp., Inc. v. Commissioner*, 70 T.C. at 359), *aff'g* T.C. Memo. 1990–484.

When an organization engages in substantial fee-for-service or other business activities, the regulations under

section 501(c)(3) provide two overlapping standards to consider: (1) whether the organization was "organized or operated for the primary purpose of carrying on an unrelated trade or business, as defined in section 513", 26 C.F.R. sec. 1.501(c)(3)–1(e), and (2) whether the activity fails to further the organization's exempt purpose, 26 C.F.R. sec. 1.501(c)(3)–1(c)(1). If the answer to either of those is yes, then the organization is not operated exclusively for an exempt purpose. PIC fails under both standards.

If a trade or business is not "substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived)" to the performance of a "charitable, educational, or other purpose or function constituting the basis for its exemption under section 501", then it is an "unrelated trade or business". Sec. 513(a). A tax-exempt organization cannot operate for the primary purpose of carrying on an unrelated trade or business. 26 C.F.R. sec. 1.501(c)(3)–1(e). We are to "consider all the circumstances" in deciding whether PIC is operated for the primary purpose of carrying on an unrelated trade or business or whether PIC's fee-generating activity furthered a charitable purpose. Important factors indicating a nonexempt commercial purpose include "the particular manner in which an organization's activities are conducted, the commercial hue of those activities, and the existence and amount of annual or accumulated profits". *B.S.W. Grp., Inc. v. Commissioner*, 70 T.C. at 358.

PIC required the payment of fees in more than 99% of its transactions. By the end of 2003, PIC had generated accumulated profits of $3,592,271. With the small exception of interest and capital gains from securities, seller fees were PIC's only source of revenue in 2002 and 2003. PIC contracts with RDI encouraged "clos[ing] the highest possible number of [t]ransactions" and "quickly obtain[ing] market share" and resulted in significant funds paid to PIC's director's wife.

As a purported charitable organization, PIC nominally satisfied HUD guidelines as a source for down payment assistance; [13] but in fact PIC's arrangement with sellers (i.e.,

---

[13] With regard to FHA loans, 12 U.S.C. sec. 1709(b)(9)(B) (2012) allows borrowers to acquire down payment funds from family members. HUD policy allowed down payment funds from a few additional sources: the borrower's employer or labor union, a governmental entity, a *charitable orga-*

Continued

PIC pays down payment money into escrow in advance of closing and obtains reimbursement of it from the seller through the closing) was substantially equivalent to transactions that were disallowed under HUD policy, i.e., home sellers providing potential buyers with down payments to facilitate sales. *See infra* note 14. By using its founder's expertise and relationships in the real estate business and using its ability to facilitate otherwise impermissible transactions for the apparent benefit of both sellers and buyers, PIC was able to create a lucrative fee-generating business.

Apart from funding buyers' grants for the benefit of sellers, PIC's seller-related activities did nothing to further PIC's purported charitable goals. *See* Rev. Rul. 2006–27, *supra*. PIC's primary purpose was to broker as many transactions as possible and thus to generate significant net profits, regardless of whether the transactions achieved a charitable end. Accordingly, even if PIC's DPA program had served a charitable class of buyers (it did not), PIC did not operate exclusively for charitable purposes. *See Easter House v. United States*, 12 Cl. Ct. 476, 486 (1987) (holding that an adoption agency that provided related health and educational services to pregnant women who agreed to place their newborns for adoption with the organization was not exempt because the business purpose was the primary goal of the adoption agency), *aff'd without published opinion*, 846 F.2d 78 (Fed. Cir. 1988). Rather, since PIC's fee-generating activity was its primary purpose for operating and that activity was not "substantially related * * * aside from the need of such organization for income or funds" to a charitable end, PIC operated for the primary purpose of carrying on an "unrelated trade or business". *See* sec. 513; 26 C.F.R. sec. 1.501(c)(3)–1(e).

PIC argues that it did not give seller funds to a buyer— an important requirement under the HUD guidelines. *See Penobscot Indian Nation v. HUD*, 539 F. Supp. 2d 40, 44 (D.D.C. 2008). PIC contends that it received fees from sellers only after closing and that the fees were necessary for PIC

*nization*, and a close friend with a clearly defined and documented interest in the borrower. HUD Handbook 4155.1, Rev. 5, at 2–24 (October 2003). However, HUD policy did not allow down payment assistance to come directly from home sellers or parties with an interest in the transaction. *Penobscot Indian Nation v. HUD*, 539 F. Supp. 2d 40, 44 (D.D.C. 2008).

to recoup the costs of its grants, and, therefore, the seller-paid fees furthered the grant-making purpose.[14] This argument misses its mark. Before PIC gave funds to a buyer, PIC required a promise from the seller that, immediately after closing, the seller would pay PIC the buyer's grant amount plus a fee–and the evidence shows that in fact the seller's payment was made to PIC from the escrow, i.e., without risk that the seller would renege. In essence, a DPA grant went from PIC to the buyer, to the seller, and right back to PIC. More important, however, PIC's argument fails to provide an explanation for its very substantial profits and for its obvious profit motive. No entity accumulates profits of $3.6 million in two years by accident. Those profits are strong evidence that PIC's commercial activities with sellers were its primary purpose.

D. *Educational and other activities*

PIC also argues that it devoted significant time and resources to financial counseling seminars and other educational programs designed to prepare potential home buyers for the responsibility of home ownership, which PIC contends supports a conclusion that it operated for educational purposes. PIC's efforts to educate potential buyers were significant and perhaps even commendable. However, we cannot analyze PIC's educational activities in a vacuum; they must be considered in conjunction with PIC's other substantial activities—in particular its DPA program and transactions with sellers, neither of which furthered exempt purposes. Many for-profit, non-exempt businesses go to considerable efforts to educate their potential consumers. Teaching *can* further a tax-exempt educational purpose, or it can further non-exempt purposes. In PIC's case, its teaching was a means to the end of "clos[ing] the highest possible number of [t]ransactions".

---

[14] PIC argues that its recouping its DPA grants from the sellers is similar to a tax-exempt hospital's recouping fees associated with medical care it provides. A hospital provides medical care, whereas PIC does not, of course, provide housing, nor does it actually provide down payment funds for the house sale but merely provides cover for the fact that the *seller* is providing the down payment. But even assuming that PIC's activity is analogous to that of a tax-exempt hospital, PIC points to no instance of a tax-exempt hospital's profiting so handsomely from the recouping of fees.

Moreover, as the Supreme Court has instructed, "the presence of a single non-educational [or non-charitable] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational [or charitable] purposes." *Better Bus. Bureau of Wash., D.C.*, 326 U.S. at 283. Accordingly, even if PIC provided helpful education to potential buyers, the presence of its other substantial non-exempt activities prevents us from concluding that PIC was operated exclusively for educational purposes.

E. *Conclusion*

Since we have determined that PIC failed to serve a charitable class and that a substantial amount of its activity did not further a charitable purpose (but furthered instead an unrelated business), and since either of these determinations by itself is fatal to PIC's claim to be an organization described in section 501(c)(3), we need not address the IRS's other reasons for revoking PIC's exempt status (i.e., private inurement and private benefit).

III. *Retroactive effect*

The last issue we must address is the propriety of the IRS's making its revocation retroactive. As we explained above in part I, section 7805(b)(8) and 26 C.F.R. sec. 601.201(n)(6)(i) give the IRS discretion to retroactively revoke exemption rulings or determination letters where "the organization omitted or misstated a material fact, [or] operated in a manner materially different from that originally represented"; and we review that retroactive revocation for abuse of discretion.

PIC operated in a manner that was different from what it represented to the IRS in its application. PIC represented there that its purpose was to "provide down payment assistance program for low income individuals and families", that its "down payment assistance will be provided only to individuals who have a financial need for such services", and that PIC intended to meet the safe harbor guidelines set forth in Rev. Proc. 96–27, *supra*, which would assure that certain percentages of individuals PIC served had incomes at specified levels below the area's median income. Despite these representations, both the administrative record and the

trial record show that PIC did not have any income limitations for its grantees, nor did it screen buyers for down payment assistance based on income. Rather, PIC provided a grant to any home buyer who qualified for a loan.

PIC reported on its Form 1023 that it would "solicit gifts from corporations, foundations, and individuals with whom the members, directors and officers have personal relationships." However, PIC received virtually all of its funding from sellers; and contrary to PIC's characterization, seller payments were not gifts nor did PIC have personal relationships with sellers. Instead, those receipts were in consideration for the services PIC provided the sellers.

For these reasons, we conclude that the IRS did not abuse its discretion in revoking its initial determination retroactively.

*Decision will be entered for respondent.*