T.C. Memo. 2019-94

UNITED STATES TAX COURT

GIVING HEARTS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18621-16X.                     Filed July 29, 2019.

John J. Simon, for petitioner.

William I. Miller and Laura A. Price, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUY, Special Trial Judge:  On May 26, 2016, respondent issued a final

adverse determination letter to Giving Hearts, Inc. (petitioner), revoking its status

[*2] as an organization exempt from Federal income tax under section 501(a).[1] The revocation is effective retroactively to January 1, 2010.

Petitioner challenges respondent's determination and has invoked the Court's jurisdiction by filing a timely petition for a declaratory judgment pursuant to section 7428(a) and Rule 210.  At the time the petition was filed, petitioner's principal place of business was in Michigan.  The record reflects that there is an actual controversy and that petitioner has exhausted its administrative remedies. See Rule 210(c)(2), (4).

Although the parties filed with the Court the entire administrative record in accordance with Rule 217(b), they were not in agreement that it contained all the relevant facts.  Consequently, the case was called for trial and both parties appeared and presented evidence.  See Rule 217(a).

FINDINGS OF FACT

I.  Window Plus, Inc.

In 1987 Ronald Carrier organized Window Plus, Inc. (Window Plus or the company), a for-profit company specializing in the sale of replacement windows and other home improvement services to residential customers.  Mr. Carrier was a

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended and in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] shareholder and the president of Window Plus at all times relevant to this case. His cousin, Donald Carrier, served as vice president and general manager of the company until 2010.

Window Plus promotes its business through telemarketing, referrals, online marketing, and trade shows. The company traditionally has relied heavily on its in-house telemarketing staff to generate sales leads.[2]

In 2008 Window Plus employed a staff of 16 full-time telemarketers. In the years that followed, however, Window Plus reduced its telemarketing staff to eight employees as a result of the implementation of the National Do Not Call Registry, a Federal program designed to allow individuals to avoid unsolicited phone calls from commercial telemarketers. The program, conducted jointly by the Federal Trade Commission and the Federal Communications Commission, was established in accordance with the provisions of the Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003).

Confronted with a dwindling pool of potential customers willing to accept telemarketing calls, Mr. Carrier began to think of ways to enhance Window Plus' telemarketing efforts without violating the do-not-call registry law. Recognizing

---

[2]The term "sales leads" refers to potential customers who agree to meet with a sales representative for a product demonstration and presentation of an estimate of the cost of a particular home improvement project.

**[*4]** that charitable organizations were not subject to the restrictions of the do-not-call registry, Mr. Carrier decided that it would make good sense to combine for-profit telemarketing sales efforts with charitable giving.

II. Giving Hearts, Inc.

In 2009 Diane Carrier (Mr. Carrier's wife), acting as president, Shirley Carrier (Donald Carrier's wife), acting as secretary, and Henry Lock, a certified public accountant, acting as treasurer, organized petitioner as a Michigan nonprofit corporation.  Later that same year petitioner filed Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, with the Internal Revenue Service (IRS).  The IRS reviewed petitioner's application, requested additional information, required petitioner to amend its articles of incorporation, and subsequently granted petitioner's application for exemption from Federal income tax, effective December 21, 2009.

Petitioner's articles of incorporation, as amended, state that petitioner is organized

> exclusively for charitable, religious, educational, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code.

**[*5]** For State of Michigan purposes the corporation is to receive and administer funds for the not for profit exempt organizations. More specifically the corporation will contract with businesses to raise funds and awareness for the not for profit organizations and distribute money to selected 501(c)(3) qualifying organizations.

III. Petitioner's Corporate Sponsorship Program

Petitioner established what it calls a "corporate sponsorship program" with the aim of providing telemarketing opportunities for businesses "to help generate leads" and "give back to a charity". Mr. Carrier believed that Window Plus and similar businesses would find petitioner's corporate sponsorship program to be a worthwhile endeavor.

In 2011, under Mr. Carrier's direction, Window Plus' telemarketing staff began to test petitioner's corporate sponsorship program by making telemarketing calls to potential customers. It appears that some potential customers did not appreciate the telemarketing calls because in December 2011 the attorney general for the State of Michigan sent a memorandum to the IRS stating that a number of individuals had filed complaints alleging that petitioner was operating as "a front for a window sales operation."

In April 2012 the IRS notified petitioner that it was opening an examination regarding its exempt status.

**[*6]** In June 2012 Mr. Carrier and his wife executed a corporate sponsorship agreement on behalf of Window Plus and petitioner, respectively, which provided in relevant part:

> Giving Hearts (hereafter referred to as "sponsor") is a nonprofit 501(c)(3) Charity. Sponsor agrees to authorize Window Plus Inc, (hereafter referred to as sponsee) a for-profit corporation the expressed right to fundraise in its behalf as set forth in this Agreement.
>
> **FUNDRAISING.** Sponsee agrees to pay Sponsor an amount of $5.00 per scheduled appointment. All company scheduled appointments qualify regardless of their source origin. Appointment origin may include, but is not limited to, Telemarketing, Show Events, Canvasing [sic], Print Advertising, TV Advertising, Radio Advertising, Referrals and Previous Customers.
>
> **CAMPAIGNING.** Sponsor authorizes Sponsee to make Telemarketing calls on their behalf. All calls made by a sponsee agent will identify themselves first, then announce the call is made on behalf of Sponsor before reciting the offer presentation. It is understood that a majority percentage of calls will be to potential customer [sic] on the "Do Not Call" Registry.
>
> **GOVERNING LAW.** Under the "Do-Not-Call" Implementation Act of 2003 * * * Telemarketers are required to stop calling consumers within 31 days of the consumer registering their phone number with the national "Do-Not-Call" Registry. * * * Exceptions to the law includes calls from or on behalf of charities * * *. Sponsor is allowed the exemption and calls are permitted to be made on behalf of charity even if the number is registered with the "Do Not Call" Registry. Sponsee agrees to follow the pertinent part of the Law that governs charity calling. Operating in compliance with the Law is required by Sponsee and its agents.

**[*7]**  Window Plus' telemarketing staff made telephone calls to potential customers and solicited donations on petitioner's behalf, generally using the following script:

> Hello *  *  * this is _____ calling on behalf of Giving Hearts.  We are a non-profit organization helping to fund local children's charities.  We have sponsored the Window Plus company for the purpose of fund raising.  For every home owner that accepts a product demonstration and free estimate our charity [Giving Heart] will receive a donation from Window Plus.  *  *  *
>
> Well, for a limited time Window Plus is offering a onetime special offer of 30% off their triple-pane insulated replacement window which is guaranteed in writing to save a minimum of 40% on your annual heating cost. *  *  *
>
> Not only will you be helping a charity receive a donation, you'll also be getting the right advice and the right price on energy efficient products that will help save the planet while saving money off your ever increasing monthly utility bills.  A Window Plus representative will leave you with a free estimate that is good for one full year. Please understand that you are under no obligation to purchase anything.  They just want to show you their products and get you that free estimate so in the future if you decide to replace any windows, you'll get back in touch with them.  So, with this in mind, I will have the representative stop by <u>DAY</u> and <u>TIME</u>.

In 2011 Window Plus reported that 50% of its sales leads and 33% of its sales originated from telemarketing calls.  In 2012 Window Plus reported that 44% of its sales leads and 30% of its sales originated from telemarketing calls.

**[*8]** IV.  Executive Reorganization

In January 2013 Diane Carrier and Shirley Carrier stepped down, and Natalie Simon (Ms. Simon) and her mother, Millicent Simon, family friends of the Carriers, replaced them as petitioner's president and vice president, respectively. Ms. Simon is an experienced public relations professional.

V.  Efforts To Expand Participation in the Corporate Sponsorship Program

Mr. Carrier approached tradesmen that he knew and inquired whether they would be interested in participating in petitioner's corporate sponsorship program. Two of those tradesmen, Gary Smith and David Brown, understood that petitioner's corporate sponsorship program was designed to allow them to generate sales leads in exchange for charitable contributions.  Both of them decided not to participate in petitioner's program considering the startup costs (i.e., equipment and additional staffing) associated with a telemarketing program. In addition Mr. Smith was reluctant to participate in the program so long as any question remained about petitioner's exempt status.

Ms. Simon also approached for-profit companies and inquired whether they would be interested in participating in petitioner's corporate sponsorship program. The companies she approached expressed interest only if the IRS examination regarding petitioner's tax-exempt status was resolved in petitioner's favor.

[*9] VI. <u>Charitable Contributions and Donations</u>

Petitioner filed Forms 990-EZ, Short Form Return of Organization Exempt From Income Tax, for the taxable years 2010, 2011, 2012, 2013, 2014, 2015, and 2016 reporting that it received charitable contributions of $1,102, $6,421, $5,480, $7,081, $8,334, $7,003, and $5,445, respectively. Petitioner used a small portion of the contributions to pay its annual filing fees and certain professional fees. For the taxable years 2010, 2011, 2012, 2013, 2014, 2015, and 2016 petitioner reported that it made distributions to charitable organizations of $1,102, $4,000, $3,000, $272, $4,375, $9,250, and $9,500, respectively.

VII. <u>Final Adverse Determination</u>

After issuing multiple proposals to revoke petitioner's exempt status and developing a voluminous administrative record, the IRS issued the final adverse determination letter in dispute. The final adverse determination letter states that the decision to revoke petitioner's tax-exempt status was warranted because petitioner was "not operated exclusively for exempt purposes within the meaning of Internal Revenue Code [sec.] 501(c)(3) and Treasury Regulation [sec.] 1.501(c)(3)-1 * * * and operated for substantial private and commercial purposes, rather than exclusively for public purposes."

**[\*10]**                                    OPINION

Section 7428(a)(1)(A) confers jurisdiction on the Court to make a declaration in a case of actual controversy involving a determination by the Secretary with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a).  The flush text of section 7428(a) provides in pertinent part that "a determination with respect to a continuing qualification * * * includes any revocation of or other change in a qualification".

Petitioner bears the burden of establishing that respondent's determination is erroneous.  See Rule 142(a); Partners in Charity, Inc. v. Commissioner, 141 T.C. 151, 162 (2013).  The evidentiary record includes the evidence that the parties presented at trial and the administrative record.  See Rule 217.

Section 501(a) generally exempts from taxation an organization described in subsection (c).  Section 501(c)(3) describes a qualifying organization in relevant part to include "[c]orporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes".  An organization that qualifies under section 501(c)(3) not only is exempt from Federal income tax, but also may solicit and accept donations which

[*11] are normally deductible by the donor against his or her Federal tax.  See sec. 170(c)(2).

Respondent does not dispute that petitioner was organized for exempt purposes (the so-called organizational test)[3] but instead determined that it does not operate exclusively for exempt purposes (the so-called operational test). Specifically, respondent maintains that petitioner operates as a conduit to generate sales leads (and revenues) for commercial businesses.

Petitioner avers, and we agree, that it operates (at least in part) to further a charitable purpose.[4]  In short, petitioner collects donations from Window Plus and transfers those funds to other charitable organizations.  Petitioner correctly asserts that the Code does not preclude the use of for-profit enterprises, such as Window Plus, to solicit or collect charitable donations.

What petitioner overlooks or fails to acknowledge, however, is that the standard for tax-exempt status prescribed in section 501(c)(3) requires that an

---

[3]The so-called organizational test generally requires that an organization's articles of organization limit its purposes to exempt ones and do not expressly empower it to engage, except insubstantially, in activities that do not further an exempt purpose.  Sec. 1.501(c)(3)-1(b)(1)(i), Income Tax Regs.

[4]In applying sec. 501(c)(3), the term "charitable" is used in its generally accepted legal sense and is not limited by the enumerated list in that section.  Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.

**[*12]** organization be "operated exclusively" for an exempt purpose.  Section

1.501(c)(3)-1(c)(1), Income Tax Regs., describes the so-called operational test as

follows:

> (c) Operational test--(1) Primary activities.--An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

In this regard the presence of a single substantial purpose that is not described in

section 501(c)(3) precludes exemption from tax under section 501(a) regardless of

the number or the importance of the purposes that are present and described in

section 501(c)(3).  See Better Bus. Bureau v. United States, 326 U.S. 279, 283

(1945).

"Under the operational test, the purpose towards which an organization's

activities are directed, and not the nature of the activities themselves, is ultimately

dispositive of the organization's right to be classified as a section 501(c)(3)

organization exempt from tax under section 501(a)".  B.S.W. Grp., Inc. v.

Commissioner, 70 T.C. 352, 356-357 (1978).  As the Court noted in Partners in

Charity, Inc. v. Commissioner, 141 T.C. at 164:  "Even in a commercial, profit-

motivated context, such activities may be wholesome and commendable; but they

**[*13]** will not support tax-exempt status unless they are undertaken to further an exempt purpose."

Petitioner's corporate sponsorship agreement, by design and in effect, permits for-profit businesses (such as Window Plus) to invoke its name as part of a telemarketing pitch intended, first and foremost, to generate sales leads and revenues. In other words, although telemarketing calls are ostensibly made on petitioner's behalf, the real purpose of the calls is business promotion. As the corporate sponsorship agreement and the telemarketing pitch make clear, see supra pp. 6-7, a participating business would be obliged to make a charitable contribution to petitioner only when a potential customer agreed to an in-home product demonstration. Considering all of the facts and circumstances, the Court concludes that petitioner was primarily engaged in generating sales leads (and ultimately revenues) to advance a commercial enterprise, with charitable donations arising only as a function of the businesses' success in securing in-home product demonstrations and presenting project estimates to potential customers.

Generating sales leads in support of a for-profit enterprise is not an exempt purpose within the meaning of section 501(c)(3), nor is it substantially related to such an exempt purpose. See sec. 1.501(c)(3)-1(d)(1), Income Tax Regs. It necessarily follows that more than an insubstantial part of petitioner's activities

[*14] was not in furtherance of an exempt purpose. See sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. Thus, petitioner does not qualify as an organization exempt from tax under section 501(a).

Petitioner contends that "the investigatory and intervening action" undertaken by the State of Michigan and respondent created an appearance of self-dealing (between petitioner and Window Plus) and impaired its ability to recruit other businesses to participate in its corporate sponsorship program. Petitioner misses the point. Simply put, whether other for-profit enterprises participated in petitioner's corporate sponsorship program would not alter the fact that petitioner was not operated exclusively for one or more exempt purposes as discussed herein. See sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.

Consistent with the foregoing, we hold that petitioner was not operated exclusively for one or more exempt purposes within the meaning of section 501(c)(3) and that respondent did not err in determining that petitioner is not eligible for an exemption from taxation under section 501(a).

To reflect the foregoing,

Decision will be entered for respondent.