T.C. Memo. 2017-45

UNITED STATES TAX COURT

ESTATE OF CHARLES KONKUS, DECEASED,
LINDA COLLINS, ADMINISTRATOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5783-13L.                    Filed March 16, 2017.

Alvin S. Brown, for petitioner.

Shawna A. Early, for respondent.

**[\*2]**     MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Pursuant to section 6330(d),[1] the estate[2] seeks review of respondent's determination to sustain the filing of a Notice of Federal Tax Lien (NFTL) and a notice of intent to levy to collect assessed section 6700 tax shelter promotion penalties for Mr. Konkus' taxable years 2002 and 2003 of $3,411,577 and $3,252,130, respectively.  The issue for decision is whether the Internal Revenue Service (IRS) Appeals officer abused his discretion by rejecting Mr. Konkus' offer-in-compromise and sustaining the proposed collection actions.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.  (Figures may differ because of rounding.)

[2]Charles M. Konkus resided in Illinois when the petition was filed.  He died intestate after trial.  Linda Collins was thereafter appointed administrator of Mr. Konkus' estate, and by subsequent order of this Court the estate was substituted as petitioner.

[*3] I.   Assessment of Section 6700 Penalties and Refund Claim

During the years in question Mr. Konkus was the president and controlling officer of Partners In Charity, Inc. (PIC), which held itself out as a section 501(c)(3) organization.  At that time PIC operated a downpayment assistance program through which it provided downpayments to home purchasers who (PIC claimed) were of modest means contingent on the seller's reimbursement of the downpayment and remission to PIC of an administrative fee.  On April 17, 2006, in response to a complaint filed by the United States, the U.S. District Court for the Northern District of Illinois entered a permanent injunction barring Mr. Konkus and PIC from characterizing, in any way, the payments from sellers to PIC as tax-deductible charitable contributions, United States v. Partners In Charity, Inc., No. 05-cv-6374 (N.D. Ill. Apr. 17, 2006) (order granting permanent injunction), and this Court ultimately upheld the IRS' retroactive revocation of PIC's tax-exempt status, Partners In Charity, Inc. v. Commissioner, 141 T.C. 151 (2014).

In relation to Mr. Konkus' involvement with PIC, on June 16, 2008, respondent issued to him a CP15, Notice of Penalty Charge, advising of the assessment of section 6700 penalties against him, for the promotion of an abusive tax shelter, of $3,411,577 and $3,252,130 for 2002 and 2003, respectively.  On

[*4] July 15, 2008, Mr. Konkus submitted a Form 6118, Claim for Refund of Income Tax Return Preparer and Promoter Penalties, contesting the assessment of the section 6700 penalties (refund claim) but did not remit 15% of each penalty as required by section 6703(c)(1).[3]

II.    Collection Actions and Hearing Requests

Also on July 15, 2008, respondent filed an NFTL and subsequently issued to Mr. Konkus a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 (lien notice).  On July 24, 2008, respondent issued to Mr. Konkus a Letter 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice), informing him of respondent's intent to levy on his property to collect the unpaid section 6700 penalty assessments for 2002 and 2003. Mr. Konkus timely requested a hearing with respect to both the lien notice and the levy notice.

Appeals acknowledged Mr. Konkus' hearing requests on September 19, 2008, and approximately one month later, an Appeals officer held an initial

---

[3]Mr. Konkus also submitted on July 28, 2008, a Form 656-L, Offer in Compromise (Doubt as to Liability) (OIC-DATL), wherein he disputed the sec. 6700 penalties as "contrary to the clear language of section 6700."  Appeals rejected the OIC-DATL on the grounds that sec. 6700 penalties "are not subject to compromise based upon doubt as to liability."  The estate concedes that the OIC-DATL is not at issue.

**[\*5]** telephone conference with Mr. Konkus and his counsel.  However, on

February 10, 2009, the section 6330 hearing was suspended pending disposition of

Mr. Konkus' refund claim.

### III.  Denial of Refund Claim

The refund claim was denied on February 10, 2010, in a letter advising

Mr. Konkus that he could appeal to Appeals within 30 days.  Mr. Konkus did so,

and his appeal was considered by an Appeals officer not associated with

Mr. Konkus' section 6330 hearing.[4]  On April 23, 2012, Mr. Konkus' appeal of his

rejected refund claim was denied.

### IV.  Resumption of Section 6330 Hearing

#### A.  Proposed Conference

On the same day the appeal of Mr. Konkus' refund claim was denied, the

Appeals officer who had been assigned to Mr. Konkus' section 6330 hearing while

---

[4]Although the parties stipulated that Appeals Officer Curtis Megyesi (AO Megyesi), who issued the notice of determination after Mr. Konkus' sec. 6330 hearing, also issued the Appeals memorandum rejecting the appeal of Mr. Konkus' refund claim, this stipulation is contradicted by the administrative record.  AO Megyesi's case notes record that on April 23, 2012, he <u>received</u> an Appeals officer's memorandum rejecting the appeal of Mr. Konkus' refund claim.  We therefore disregard the stipulation and find that the Appeals memorandum rejecting the appeal of Mr. Konkus' refund claim was prepared not by AO Megyesi but instead by a different Appeals officer.  <u>See</u> Rule 91(e); <u>Jasionowski v. Commissioner</u>, 66 T.C. 312, 318 (1976).

**[\*6]** his refund claim was pending, AO Megyesi, took the hearing out of suspension and sent Mr. Konkus a letter proposing a telephone conference. AO Megyesi further explained in the letter that Mr. Konkus was entitled to a hearing with an Appeals employee who had had no prior involvement with the years in question, stated that he could not recall having had any prior involvement with the years in question, and requested that Mr. Konkus notify him if he believed otherwise. There is no evidence that Mr. Konkus notified AO Megyesi of any concern regarding prior involvement with respect to the section 6700 penalties for 2002 and 2003.

### B. Mr. Konkus' Offer-in-Compromise and Financial Information Submitted

On June 11, 2012, Mr. Konkus submitted as a collection alternative, on a Form 656, Offer in Compromise, an offer to pay $2,215 to compromise his combined $6,663,707 section 6700 penalty liabilities based on doubt as to collectibility (OIC-DATC). Mr. Konkus supplemented his offer with a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, covering himself and a Form 433-B, Collection Information Statement for Businesses, covering PIC. The Form 433-B included PIC's 2011 Form 990, Return of Organization Exempt From Income Tax, a balance sheet reflecting PIC's

[*7] financial condition as of December 27, 2012, and a profit and loss statement covering PIC's operations from January 1 through December 27, 2012. The OIC-DATC and supporting materials were forwarded to AO Megyesi on July 3, 2012, for review.

The Form 433-A reported that Mr. Konkus owned assets with a total current value of $8,163, comprising the following:

| Asset | Current value |
|---|---|
| Life insurance policy | [1]$3,683 |
| 1974 Nissan 280Z | [2]4,480 |
| Total | 8,163 |

[1]Mr. Konkus reported the life insurance policy's fair market value as $7,353 and its outstanding loan balance of $2,774, yet reported total available cash as $3,683. The record is silent regarding this apparent discrepancy.

[2]Mr. Konkus reported the Nissan's fair market value as $5,600 but reported total equity of $4,480.

The Form 433-A reported the following monthly items of income and expense:

| Income | Amount |
|---|---|
| Wages | $1,372 |
| Total | 1,372 |

[*8]

| Expense | Amount |
|---|---|
| Food, clothing, and miscellaneous | $565 |
| Housing and utilities | 314 |
| Vehicle operating costs | 262 |
| Out-of-pocket healthcare costs | 60 |
| Taxes | 125 |
| Total | 1,326 |

PIC's balance sheet appended to the Form 433-B reported that as of December 27, 2012, it had total cash of $206,500 and total other assets of $1,420,005. The same balance sheet reported $146,881 in "Loans from Stockholders" as a current liability. Mr. Konkus' Form 433-A did not report this loan as an asset. PIC's profit and loss statement for 2012 listed a health insurance expense and legal fees of $3,489 and $33,292, respectively.

C.    The Telephone Conference

On January 15, 2013, AO Megyesi held a telephone conference with Mr. Konkus and his counsel. AO Megyesi's notes of the telephone conference record that Mr. Konkus claimed he had no rent or mortgage expenses because he lived in foreclosed properties. The notes further record that Mr. Konkus claimed he paid utility expenses in the names of the properties' former owners. In

[*9] addition, the notes record that Mr. Konkus explained that although he owned a car he drove PIC's company vehicle. As his notes reflect, after discussing Mr. Konkus' and PIC's credit card statements that Mr. Konkus had submitted, AO Megyesi concluded that Mr. Konkus' and PIC's expenses were largely commingled and that in several instances PIC had paid Mr. Konkus' personal expenses and vice versa.

During the telephone conference AO Megyesi inquired as to the nature of the outstanding $146,881 "stockholder" loan reflected on PIC's balance sheet. As recorded in AO Megyesi's notes, Mr. Konkus explained that he had made this loan to PIC when it had initiated its operations but that the loan no longer had any value as PIC was unable to repay it. Mr. Konkus therefore argued that it should not be considered a collectible asset. AO Megyesi additionally reviewed Mr. Konkus' 2009 and 2010 Federal income tax returns (which Mr. Konkus had submitted) during the telephone conference. Mr. Konkus' 2009 return reported that he had made a $19,100 donation, at "thrift store value", to another not-for-profit entity of which he was the president, Restoration America.

During the telephone conference AO Megyesi informed Mr. Konkus and his counsel that the OIC-DATC would likely be rejected because, inter alia, AO Megyesi believed that Mr. Konkus' reasonable collection potential was much

[*10] higher than the $2,215 offered.  AO Megyesi's notes record that Mr. Konkus

agreed to increase his offer to $50,000 but indicated that he would not pay more.

D.    AO Megyesi's Calculation of Mr. Konkus' Reasonable Collection
      Potential

On the basis of the telephone conference and financial information which

Mr. Konkus had submitted, AO Megyesi calculated his reasonable collection

potential in an internal supplemental OIC Appeals case memorandum (case

memorandum).  AO Megyesi determined that Mr. Konkus' net realizable equity in

his personal vehicle was $1,030 after reducing Mr. Konkus' reported fair market

value of $5,600 by 20% to reflect quick sale value[5] and by a further $3,450

reduction from the quick sale value.  As to Mr. Konkus' life insurance policy, AO

Megyesi accepted Mr. Konkus' reported fair market value of $7,353 but reduced it

by its outstanding loan balance of $2,774 for a net realizable equity of $4,579.

AO Megyesi also determined that the $146,881 loan from Mr. Konkus listed

as a current liability on PIC's balance sheet should be included as an asset of

Mr. Konkus, as PIC's balance sheet from the previous month demonstrated that it

had sufficient cash to pay the balance in full.  AO Megyesi's notes reflect that, in

[5]Quick sale value is an estimate of the price a seller could get for an asset if sold quickly, usually in 90 days or less.  Quick sale value is generally calculated at 80% of the fair market value.  See Internal Revenue Manual (IRM) pt. 5.15.1.20(4) (Oct. 2, 2012).

[*11] reaching this position, he concluded that Mr. Konkus controlled PIC to such an extent that he could have caused PIC to repay the loan at any time. In drawing this conclusion, he relied on items he unearthed from PIC's profit and loss statement for 2012 (and discussed with Mr. Konkus) which demonstrated that PIC had paid significant personal expenses of Mr. Konkus in that year, including $33,000 in legal fees paid to Mr. Konkus' counsel representing him in connection with his liability for the section 6700 penalties, $3,489 in health insurance for Mr. Konkus, as well as the payment of Mr. Konkus' personal expenses with PIC's credit card previously noted.

Finally, AO Megyesi included $19,000 (of the $19,100 Mr. Konkus donated to Restoration America in 2009) as a dissipated asset of Mr. Konkus, reasoning that Mr. Konkus was aware of his section 6700 penalty liabilities at the time of donation.

AO Megyesi's determination of Mr. Konkus' net realizable equity in assets is summarized as follows:

[*12]

| Asset | Net realizable equity |
|---|---|
| 1974 Nissan 280Z | $1,030 |
| Life insurance policy | 4,580 |
| Loan to PIC | 146,881 |
| Contribution to Restoration America | 19,000 |
| Total | 171,491 |

In determining Mr. Konkus' reasonable collection potential AO Megyesi also calculated Mr. Konkus' monthly income and expenses. In so doing, AO Megyesi accepted Mr. Konkus' reported monthly income of $1,372; food, clothing, and miscellaneous expenses of $565; out-of-pocket healthcare expenses of $60; and tax expenses of $125. However, AO Megyesi did not accept Mr. Konkus' reported housing and utilities and transportation operating costs, as Mr. Konkus had informed AO Megyesi that he lived rent free in foreclosed properties and drove PIC's company car. AO Megyesi's case memorandum stated that Mr. Konkus had failed to provide evidence that he in fact paid any utility expenses, nor had he proven that he paid for gas when driving PIC's company car. According to AO Megyesi's calculations this resulted in monthly disposable income of $622; on the basis of an estimate that Mr. Konkus could pay for a period of 12 months AO Megyesi determined that he had future income of $7,466.

[*13] AO Megyesi therefore calculated Mr. Konkus' reasonable collection potential to be no less than $178,956 (comprising $171,491 of net equity in assets and $7,466 in future income).

AO Megyesi concluded in the case memorandum that Mr. Konkus' OIC-DATC should be rejected on two grounds. First, he determined that it should be rejected on public policy grounds under IRM pt. 5.8.7.7.2 (May 10, 2011) because Mr. Konkus and PIC had financially benefited from falsely advising sellers that their contributions to PIC were tax deductible. AO Megyesi believed, given that Mr. Konkus' operation of a not-for-profit entity had resulted in section 6700 penalty liabilities totaling over $6 million, that to accept his much lower offer could incentivize similarly situated taxpayers to abuse not-for-profit entities, knowing that any negative consequences would be slight. Alternatively, AO Megyesi concluded that Mr. Konkus' OIC-DATC should be rejected because his reasonable collection potential was significantly higher than his offer.

V.    Notice of Determination

Appeals issued a notice of determination to Mr. Konkus on February 8, 2013, denying his OIC-DATC and sustaining the proposed collection actions. The notice of determination stated that Mr. Konkus' OIC-DATC had been rejected on the basis of public policy provisions of the IRM because acceptance of his offer

**[*14]** would cause public reaction to be so negative as to diminish future voluntary compliance by the general public. It further reasoned that if Mr. Konkus' offer were accepted, "[e]veryone would weigh complying with federal tax laws against the potential for financial gain if there is little or no consequence to their actions." Alternatively, the notice of determination stated that Mr. Konkus' offer--either the $2,215 original amount or his increased offer of $50,000 during the telephone conference--was rejected because it was determined that he could pay a higher amount. The notice further stated that, on the basis of the financial information Mr. Konkus had provided, it was determined that an acceptable offer should be "in the range of $180,000.00 or higher" and that Mr. Konkus had refused to consider amending his offer to reflect that amount. The notice made specific reference to Mr. Konkus' $146,881 outstanding loan to PIC and concluded that Mr. Konkus "h[ad] not provided sufficient financial information for * * * [PIC] to establish that * * * [PIC] do[es] not have the ability to repay the loan."

Mr. Konkus timely filed a petition for review of the determination.

OPINION

I.  Statutory Framework and the Estate's Arguments

Section 6321 imposes a lien in favor of the United States on all property and rights to property of a taxpayer after a demand for the taxes has been made and the

[*15] taxpayer fails to pay those taxes. The lien arises when an assessment is made. See sec. 6322. The Secretary generally must file a notice of lien with certain State or local authorities where a taxpayer's property is situated for the lien to be valid against certain categories of third parties. Sec. 6323(a), (f); Behling v. Commissioner, 118 T.C. 572, 575 (2002). Section 6320 provides that the Secretary shall furnish the taxpayer with written notice of the filing of an NFTL and of the taxpayer's right to a hearing with Appeals concerning the lien. Sec. 6320(a)(1), (3).

Section 6331(a) authorizes the Secretary to levy upon property and property rights of a person liable for any tax (taxpayer) if the taxpayer fails to pay the tax within 10 days after notice and demand for payment is made. Such a levy, however, generally requires that the Secretary first notify the taxpayer in writing of his or her right to a prelevy hearing with Appeals on the issue of whether the levy is appropriate. Sec. 6330(a)(1), (b)(1).

If the taxpayer timely requests a hearing, an Appeals officer must at the hearing verify that the requirements of any applicable law or administrative procedure have been met. Secs. 6320(c), 6330(c)(1). In addition, the taxpayer may generally raise at the hearing "any relevant issue", including appropriate spousal defenses, challenges to the appropriateness of the collection action, and

[*16] possible collection alternatives. Secs. 6320(c), 6330(c)(2)(A). The taxpayer may challenge the existence or amount of the underlying tax liability, but only if he did not receive a notice of deficiency with respect to the liability or otherwise have an opportunity to dispute it. Secs. 6320(c), 6330(c)(2)(B).

At the conclusion of the section 6330 hearing the Appeals officer must determine whether to sustain the collection action and shall take into account: (1) the verification that the requirements of applicable law and administrative procedure have been met, (2) the relevant issues raised by the taxpayer, and (3) whether the proposed lien or levy action appropriately balances the need for efficient collection of taxes with the taxpayer's legitimate concern that the proposed collection action be no more intrusive than necessary. Sec. 6330(c)(3).

Section 6330(d)(1) grants this Court jurisdiction to review an Appeals officer's determination in connection with a section 6330 hearing. Where the underlying tax liability is properly at issue, we review the taxpayer's liability de novo. See Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). The parties agree that the underlying tax liability is not at issue, and the estate does not contest respondent's rejection of the OIC-DATL. Accordingly, we review the Appeals officer's rejection of Mr. Konkus' OIC-DATC and determination to sustain the proposed collection actions for abuse of discretion. See Lunsford v.

**[\*17]** <u>Commissioner</u>, 117 T.C. 183, 185 (2001); <u>Sego v. Commissioner</u>, 114 T.C. 604, 610 (2000); <u>Goza v. Commissioner</u>, 114 T.C. at 182. The Appeals officer abuses his discretion if he acts "arbitrarily, capriciously, or without sound basis in fact or law." <u>Woodral v. Commissioner</u>, 112 T.C. 19, 23 (1999). In deciding the propriety of an Appeals officer's rejection of an offer-in-compromise we do not substitute our judgment for that of the Appeals officer, and we do not decide independently the amount that we believe would be an acceptable offer-in-compromise. <u>See</u> <u>Murphy v. Commissioner</u>, 125 T.C. 301, 315 (2005), <u>aff'd</u>, 469 F.3d 27 (1st Cir. 2006).

Section 7122(a) authorizes the Secretary to compromise any civil or criminal case arising under the internal revenue laws; section 7122(c) authorizes the Commissioner to prescribe guidelines to determine when a taxpayer's offer-in-compromise should be accepted. The applicable regulations set forth three grounds for compromising a tax liability: (1) doubt as to liability, (2) doubt as to collectibility, and (3) promotion of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. "Doubt as to collectibility exists in any case where the taxpayer's assets and income are less than the full amount of the liability." <u>Id.</u> subpara. (2). However, the decision to accept or reject an offer-in-compromise is left to the Secretary's discretion. <u>Id.</u> para. (c)(1). "The determination whether to

**[\*18]** accept or reject an offer to compromise will be based upon consideration of all the facts and circumstances, including whether the circumstances of a particular case warrant acceptance of an amount that might not otherwise be acceptable under the Secretary's policies and procedures." Id.

The estate contends that AO Megyesi abused his discretion in rejecting the OIC-DATC in two major respects. First, the estate argues that AO Megyesi misapplied the IRM standards for denying Mr. Konkus' offer on public policy grounds. Second, the estate alleges that AO Megyesi failed to properly calculate Mr. Konkus' reasonable collection potential in rejecting the offer.[6] However, because we find that AO Megyesi properly calculated Mr. Konkus' reasonable collection potential and appropriately sustained the rejection of his OIC-DATC on that ground, we need not address the first argument.

---

[6]The estate also contends, for the first time on brief, that AO Megyesi was not an impartial officer as required by sec. 6330(b)(3) because he engaged in prohibited ex parte communications. The estate offers no specifics regarding this allegation nor any evidence to support it. As the record is closed, respondent would be prejudiced if we considered this issue, as he would be deprived of any opportunity to proffer evidence to rebut the allegation. We conclude that the estate's claim is untimely and decline to consider it.

**[*19]** II.     Whether AO Megyesi Abused His Discretion in Calculating Mr. Konkus' Reasonable Collection Potential

Generally, under the IRS' administrative guidance an offer to compromise based on doubt as to collectibility will be acceptable only if the offer exceeds the taxpayer's reasonable collection potential (i.e., that amount, less than the full liability, that the IRS could collect through means such as administrative and judicial collection remedies). Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517. A taxpayer's reasonable collection potential is determined, in part, using published guidelines for certain national and local allowances for basic living expenses and essentially treating income and assets in excess of those needed for basic living expenses as available to satisfy Federal tax liabilities. See Lemann v. Commissioner, T.C. Memo. 2006-37.[7]

The IRM provides procedures for analyzing a taxpayer's financial condition to determine reasonable collection potential. See IRM pt. 5.8.5.1 (Sept. 23, 2008). A taxpayer's reasonable collection potential is calculated by determining, then

---

[7]In certain cases the Secretary will accept an offer of less than the reasonable collection potential upon a showing by the taxpayer of special circumstances. See sec. 301.7122-1(c)(3), Proced. & Admin. Regs.; Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517. However, the estate has neither identified nor argued that any special circumstances exist which would compel the Secretary to accept an offer of less than Mr. Konkus' reasonable collection potential.

[*20] adding together: (1) the taxpayer's "net realizable equity", i.e., the quick sale value of the taxpayer's assets less amounts owed to secure lien holders with priority over Federal tax liens, and (2) his "future income", i.e., the amount collectible from the taxpayer's expected future gross income after allowing for necessary living expenses. See IRM pt. 5.8.5.4.1 (Oct. 22, 2010); id. pt. 5.8.5.18; see also Johnson v. Commissioner, 136 T.C. 475, 485 (2011), aff'd, 502 F. App'x 1 (D.C. Cir. 2013); Lemann v. Commissioner, T.C. Memo. 2006-37. When an Appeals officer has followed the IRS' guidelines to ascertain a taxpayer's reasonable collection potential and rejected the taxpayer's proposed collection alternative on that basis, we have found no abuse of discretion. See Murphy v. Commissioner, 125 T.C. at 321; Lemann v. Commissioner, T.C. Memo. 2006-37.

The estate chiefly contends that AO Megyesi did not calculate Mr. Konkus' reasonable collection potential as required by the IRS' guidelines but instead used an unsubstantiated estimate, citing the statement in the notice of determination that Mr. Konkus could pay an amount "in the range of $180,000.00 or higher". The estate alternatively contends that AO Megyesi improperly calculated Mr. Konkus' reasonable collection potential. However, it is clear from the case memorandum that AO Megyesi considered the financial information Mr. Konkus submitted for

**[\*21]** himself and PIC and followed the IRS' published guidelines to ascertain Mr. Konkus' reasonable collection potential.

AO Megyesi calculated the net realizable equity in Mr. Konkus' car by accepting its fair market value as Mr. Konkus reported it on the Form 433-A, $5,600, reducing it to a quick sale value of $4,480 and further reducing it by $3,450.  See IRM pt. 5.8.5.4.1.[8]  AO Megyesi calculated the net realizable equity in Mr. Konkus' life insurance policy by accepting its value as Mr. Konkus reported it on Form 433-A, $7,353, and subtracting the policy's outstanding loan balance, $2,774.  See IRM pt. 5.8.5.8 (Oct. 22, 2010).  AO Megyesi also included $19,000 that Mr. Konkus donated to American Restoration during 2009 as a dissipated asset, reasoning that at that time Mr. Konkus was aware of his large section 6700 penalty liabilities.  See id. pt. 5.8.5.16 (allowing the value of dissipated assets, including gifts, to be included in the calculation of reasonable collection potential).  AO Megyesi determined that the "thrift store value" of the

---

[8]IRM pt. 5.8.5.12 (Sept. 30, 2013) allows for the exclusion of $3,450 from the quick sale value of vehicles owned by a taxpayer and used for work, the production of income, or the welfare of the taxpayer's family.  However, this provision of the IRM was added after AO Megyesi had issued the notice of determination.  We therefore treat this reduction in the net realizable equity of Mr. Konkus' personal vehicle as a concession by respondent.  We note that Mr. Konkus' reasonable collection potential exceeds his offer despite this concession.

[*22] items as listed on Mr. Konkus' 2009 return already reflected the items' quick sale value.

Finally, AO Megyesi included the $146,881 loan that Mr. Konkus had made to PIC as a collectible asset in calculating his net realizable equity. See id. pt. 5.8.5.13 (notes receivable are considered assets and should be valued in part by what is collectible from the borrower). The estate argues that this amount should not have been included as a collectible asset because Mr. Konkus testified at trial that the amount at issue was provided to PIC as a capital contribution and not a loan. However, an Appeals officer is required to consider only the information presented by the taxpayer during a section 6330 hearing, and in reviewing the Appeals officer's determination we are likewise limited to reviewing the information presented. See Chandler v. Commissioner, T.C. Memo. 2004-7. There is no evidence in the administrative record to suggest that Mr. Konkus contended during the section 6330 hearing that the amount characterized as a loan on PIC's balance sheet actually constituted a capital contribution. To the contrary, AO Megyesi's notes of the telephone conference record that Mr. Konkus specifically referred to the $146,881 as a loan and argued that this amount was not a collectible asset because PIC could not repay it. Noting that PIC's balance sheets demonstrated that it had sufficient assets and cash to pay the outstanding

[*23] balance in full, AO Megyesi determined that the $146,881 should be included as a collectible asset. Given AO Megyesi's other findings concerning PIC's payment of Mr. Konkus' personal expenses during 2012, we do not believe it was an abuse of discretion for him to conclude that Mr. Konkus could cause PIC to repay the loan. AO Megyesi's inclusion of the $146,881 as an asset of Mr. Konkus was reasonable.

AO Megyesi likewise followed the IRS' published guidelines in computing Mr. Konkus' future income. AO Megyesi accepted the amount of monthly income Mr. Konkus reported on his Form 433-A, $1,372, and reduced it by the national standards for food, clothing, and miscellaneous and those for out-of-pocket healthcare costs Mr. Konkus claimed on Form 433-A, as well as the expense for taxes he claimed. See IRM pt. 5.15.1.8(1), (5) (Oct. 2, 2012). However, given that Mr. Konkus had advised AO Megyesi that he lived in foreclosed properties and thus had no rent expenses and drove a company car, AO Megyesi did not allow Mr. Konkus' claimed housing and utilities and transportation expenses, relying on IRM guidelines that allow the lesser of the local standard or the amount actually paid for such expenses, see id. pt. 5.15.1.7(4). AO Megyesi further concluded in the case memorandum that Mr. Konkus had provided no evidence

**[\*24]** that he personally paid either utility or gas expenses, and our review of the administrative record discloses none.

AO Megyesi's determination to reject Mr. Konkus' OIC-DATC on the grounds that his offer fell below his reasonable collection potential was not arbitrary, capricious, or without a sound basis in fact or law; it was based on a reasonable application of the IRS' published guidelines, which we decline to second-guess. See Speltz v. Commissioner, 124 T.C. 165 (2005), aff'd, 454 F.3d 782 (8th Cir. 2006). Finding no abuse of discretion, we will sustain the proposed collection actions.

To reflect the foregoing,

Decision will be entered for

respondent.