T.C. Memo. 2018-41

UNITED STATES TAX COURT

ASSOCIATION FOR HONEST ATTORNEYS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14562-15X.                    Filed April 3, 2018.

Joan Farr (an officer), for petitioner.

Patrick A. Greenleaf, for respondent.

MEMORANDUM OPINION

CHIECHI, Judge:  Respondent determined that, effective as of January 1, 2010, petitioner no longer operated in accordance with section 501(c)(3).[1]  Conse- quently, respondent further determined to revoke, effective as of January 1, 2010,

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times.  All Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*2]** petitioner's status as an organization exempt from Federal income tax (tax) under section 501(a). After having exhausted its administrative remedies, petitioner challenged those determinations by timely seeking a declaratory judgment pursuant to section 7428(a)(1). In accordance with Rule 217(b), respondent filed the administrative record underlying respondent's determinations, which was not paginated, and an identical first amended administrative record underlying those determinations (amended administrative record), which was paginated. Thereafter, at the request of petitioner to which respondent did not object, we conducted a trial. For purposes of this proceeding, the facts and the representations in the administrative record and the amended administrative record are accepted as true, see Rule 217(b), and are incorporated herein.[2]

We must decide whether to sustain respondent's determinations to revoke, effective as of January 1, 2010, petitioner's tax-exempt status under section 501(a) because, effective as of that date, it no longer operated in accordance with section 501(c)(3). We hold that we will sustain those determinations.

---

[2]Joan Farr f.k.a. Joan Heffington (Ms. Farr) was the only witness at the trial in this case. We found no facts on the basis of the record (i.e., her testimony) established at the trial in this case.

**[*3]**                                   Background

At the time it filed the petition, petitioner's principal place of business was in Kansas at the residence of Ms. Farr.

On April 18, 2003, Ms. Farr had organized petitioner as a nonprofit corporation under the laws of the State of Kansas. The purposes for which petitioner was organized, as set forth in its articles of incorporation, were "discouraging civil litigation, increasing public awareness of the legal system, and seeking 'justice for all'".

The bylaws of petitioner provided that it was to be managed by a board of directors (board) consisting of three members, one of whom was to serve for a 10-year term simultaneously as both its chief executive officer (CEO) and the president of its board (CEO/board president). Ms. Farr served as the initial CEO/board president of petitioner and continued to serve in that role at all relevant times thereafter.

The bylaws of petitioner also provided that the CEO/board president was, as part of the responsibilities of that position, to "present an annual report to the Board of Directors following the fiscal year, sign all checks and be a trustee of the properties of the Association. * * * [and] shall assume and/or appoint as neces-

**[*4]** sary the secretarial, treasury, accounting and other duties and/or responsibilities necessary to attain the goals of the Association."

The bylaws of petitioner further provided:

The CEO/Board President and/or appointed accountant/treasurer shall receive all revenue of the Association and shall maintain a complete and accurate account of all funds received and disbursed. He/she shall deposit and disburse all such funds. The CEO/Board President/treasurer shall present an annual report to the Board immediately after the close of the fiscal year listing all receipts and disbursements by budget categories.

On June 12, 2003, petitioner submitted to the Internal Revenue Service Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code (Form 1023 or application for tax exemption). In the application for tax exemption, petitioner represented, inter alia, that it would conduct five activities. The first two consisted of "mass mailings of postcards and brochures" or "send[ing] e-mails" in order "to create public awareness/seek donations to discourage litigation, improve our legal system, keep attorneys honest, save people money, reduce their stress, and seek 'justice for all'". Petitioner represented in its application for tax exemption that it would spend in the aggregate 50 percent of its time on those two activities.

In Form 1023, petitioner further represented that it would spend 20 percent of its time in order to sell a "book called Ten Secrets You Must Know Before

**[*5]** <u>Hiring a Lawyer</u> to convince people to work out their issues instead of fil[ing] lawsuits/educate public." Ms. Farr was the author of <u>Ten Secrets You Must Know Before Hiring a Lawyer</u>.

In its application for tax exemption, petitioner also represented that it would spend 20 percent of its time in order to "monitor A.H.A.! website to assist people having attorney difficulties, sell book, answer questions, discourage litigation, and acquire atty members".

In Form 1023, petitioner further represented that the fifth activity in which it would engage would be the "preparation of legal documents in anticipation of taking current case before the U.S. Supreme Court for public awareness in seeking 'justice for all'" and that it would spend less than 10 percent of its time on that activity.

On November 19, 2003, respondent sent a letter to petitioner (November 19, 2003 determination letter) in which respondent made the following determinations, effective as of April 18, 2003: "Based on information you supplied, and assuming your operations will be as stated in your application for recognition of exemption, we have determined you are exempt from federal income tax under section 501(a) of the Internal Revenue Code as an organization described in

**[\*6]** section 501(c)(3)." Respondent emphasized in the November 19, 2003 determination letter that respondent's

> determination is based on evidence that your funds are dedicated to the purposes listed in section 501(c)(3) of the Code. To assure your continued exemption, you should keep records to show that funds are spent only for those purposes. If you distribute funds to other organizations, your records should show whether they are exempt under section 501(c)(3). In cases where the recipient organization is not exempt under section 501(c)(3), you must have evidence that the funds will remain dedicated to the required purposes and that the recipient will use the funds for those purposes.
>
> If you distribute funds to individuals, you should keep case histories showing the recipients' names, addresses, purposes of awards, manner of selection, and relationship (if any) to members, officers, trustees or donors of funds to you, so that you can substantiate upon request by the Internal Revenue Service any and all distributions you made to individuals. (Revenue Ruling 56-304, C.B. 1956-2, page 306.)

Respondent also informed petitioner in the November 19, 2003 determination letter, inter alia, that petitioner is "not required to file Form 990, Return of Organization Exempt From Income Tax, if your [petitioner's] gross receipts each year are normally $25,000 or less."

By letter dated March 15, 2013, and sent to Joan Heffington (i.e., Ms. Farr), respondent confirmed that respondent had decided to examine petitioner's operation and activities with respect to 2011. As a result of respondent's examination for that year, respondent decided to expand respondent's examination of peti-

**[*7]** tioner's operation and activities to include 2010 and 2012 and so notified petitioner in Form 4564, Information Document Request, dated May 1, 2013.

During 2010, 2011, and 2012, Ms. Farr used certain of petitioner's funds when she engaged primarily in three activities on behalf of petitioner and/or on her own behalf. She (1) provided assistance to individuals with respect to legal matters, (2) produced a quarterly newsletter and maintained a website in petition-er's name, and (3) paid certain of her personal expenses, including paying expenses for the exhumation and DNA testing of the remains of Jack Farr, her father.

During 2010, 2011, and 2012, petitioner maintained a checking account at Verus Bank in Derby, Kansas (petitioner's checking account). During those years, Ms. Farr had exclusive signature authority for that checking account.

During 2010, 2011, and 2012, Ms. Farr used petitioner's checking account to make certain purchases from certain third parties and certain cash withdrawals totaling $6,963.76, $27,388.53, and $5,349.05, respectively (collectively, pay-ments and withdrawals in question). Specifically, Ms. Farr used petitioner's checking account in 2010, 2011, and 2012 to make certain purchases from certain department stores and grocery stores, such as Dillard's, Walmart, Kwik Shop, Kohl's, Walgreens, and Dillons. In addition, Ms. Farr used petitioner's checking account in 2010, 2011, and 2012 to make automobile-related purchases from

**[*8]** certain vendors, such as QuikTrip, A&A Auto Salvage, Derby Quick Lube, K-15 Auto Salvage, and Meineke. Ms. Farr also used petitioner's checking account in 2010, 2011, and 2012 to make certain home-related and real-estate-related purchases from certain stores, such as Slumberland, Westar Energy, Lowes, T&S Tree Service, Gene's Stump Grinding Service, Dutch's, Echostar Dish, Allstate, Roberts Overdoors Inc., Lusco Brick & Stone, MY Construction, and Star Lumber & Supply. In addition, Ms. Farr used petitioner's checking account in 2010 and 2011 to make certain payments with respect to a USAA credit card. Ms. Farr also used petitioner's checking account in 2011 to make a $189.50 payment to an animal clinic and a $7,750 payment to St. John's Military School for tuition for her son, and another $100 payment to that school. In addition, Ms. Farr used petitioner's checking account in 2011 to pay $2,200 for the exhumation and DNA testing of Ms. Farr's father's remains.

Petitioner did not pay Ms. Farr a salary during any of the years 2010 through 2012. In an action that the State of Kansas commenced in 2010 against Ms. Farr for the unlawful practice of law (discussed below), Ms. Farr claimed that she was a volunteer for petitioner.

Petitioner did not issue to Ms. Farr Form W-2, Wage and Tax Statement, or any type of Form 1099 for any of those years.

**[\*9]** During respondent's examination of petitioner's operation and activities with respect to 2010, 2011, and 2012, respondent's revenue agent responsible for that examination (agent) asked Ms. Farr for documentation establishing the nature and/or the purpose of each of the payments and withdrawals in question that she had made during those years with funds from petitioner's checking account and that the agent found to be questionable transactions for petitioner, an organization that respondent had determined to be exempt from tax under section 501(a) because it was an organization described in section 501(c)(3). Ms. Farr did not provide any such documentation to the agent.

Instead, Ms. Farr informed the agent that the payments and withdrawals in question constituted repayments of one or more loans that she had made to petitioner. The agent asked Ms. Farr to provide him with documentation establishing the loans that she claimed she had made to petitioner. Ms. Farr did not give the agent any such documentation but instead reconstructed for the years 2003 through 2006 (1) the loans that she claimed she had made to petitioner and (2) the hours that she claimed she had worked for petitioner. Thereafter, Ms. Farr gave the agent a list of those reconstructed claimed loans and a list of those reconstructed claimed hours.

[*10] During the period 2003 through 2012, petitioner did not execute any promissory notes payable to Ms. Farr and did not make any payments of interest to her.

On December 7, 2009, the State of Kansas commenced an action in the Eighteenth Judicial District Court, Sedgwick County, Kansas (Sedgwick County district court), against Ms. Farr for the unauthorized practice of law and for violations of the Kansas Consumer Protection Act (Kansas action against Ms. Farr). At a proceeding on December 6, 2010, that the Sedgwick County district court held, that court issued its findings and rulings with respect to the Kansas action against Ms. Farr, including in pertinent part the following:

> One of the issues that has been argued [is] who is the defendant and when I say "who is the defendant" Mrs. Heffington [Ms. Farr] versus the Association [petitioner]. The State never raised the issue of alter ego in this case and the Association has not been named as a party in this case. So, any relief that I order is solely against Mrs. Heffington.

> Mrs. Heffington has raised the distinction between the Association doing the work and Mrs. Heffington doing the work. She's testified that and repeatedly attempted to elicit testimony that AHA was doing the work and not Mrs. Heffington.

> Now, the only evidence in that regard or any of the remedies that I'm considering concerns Mrs. Heffington's actions. That is all the court is going to consider.

[*11] *       *       *       *       *       *       *

Now, in this case I've heard the evidence and I've heard the testimony of several witnesses both for the State and for Mrs. Heffington. I went back and I've looked at the [sic] all documents that have been admitted and just listening to what Mrs. Heffington has said and/or the testimony that's come through some of her witnesses there has been seventy thousand dollars in contributions for services in assisting people in legal matters. There have been at least four clients.

She's dodged, in my opinion, a significant bullet by not producing the documents that were ordered produced because it's very real, very conceivable that the number of clients or people she has consulted, whether or not they made payments, could be higher.

More than one party entered into the contingency contract. I note even Mrs. Heffington slipped one time and called it a legal agreement. And since 2005, Mrs. Heffington has known that the attorney general was reviewing her activity.

*       *       *       *       *       *       *

She concedes that she drafted pleadings and court papers. She drafted demand letters. She negotiated on behalf of the clients. She mediated and the court notes it was to the detriment to Mr. Frank. Her actions in this court's experience were detrimental to Mr. Frank.

She also participated in preparing settlement proposals. * * * And the court notes she stated she gave personal opinion based upon research that she obtained at the law library.

Under any definition under any burden of proof at law it's clear that Mrs. Heffington was practicing law and that there's been no proof that she has as [sic] license to practice law under the State of Kansas. Merely saying you are not a lawyer and that you do not give

**[*12]** legal advice does not negate giving legal advice in the fashion a lawyer would.

Merely saying you are not a lawyer and do not give legal advice does not negate preparing legal papers for someone as giving legal advice.

So, in addition, the court finds for purposes of this hearing that Sigg, Keck, Frank[3] and Brunch were consumers the State has proven were given assistance by Mrs. Heffington illegally without a license.

This is not family and friends sitting round griping about litigation. It's conceivable and I'm assuming everybody has had a family member who has been involved in litigation has complained about their lawyers or, you know, one family member says you really ought to do this or another family member says that. That's not what we're talking about in this instance. Arguably that's prohibitive conduct. That's not what this is.

These are third-parties. These were third-parties who were brought into contact with Mrs. Heffington through solicitation and other similar commercial means.

On February 10, 2011, the Sedgwick County district court entered a default judgment and an injunction against Ms. Farr (February 10, 2011 injunction) for the unauthorized practice of law and for committing deceptive practices in violation of the Kansas Consumer Protection Act.

---

[3]"J. Sigg", "M. Sigg", "E. Keck", and "T. Frank" were shown as members of petitioner in a list of members during 2011 that Ms. Farr maintained on behalf of petitioner.

[*13] Ms. Farr was evidently undeterred by the February 10, 2011 injunction of the Sedgwick County district court prohibiting her from advising or assisting others in legal matters. In August 2011 John Sigg (Mr. Sigg) entered into an agreement with petitioner to accept $20,000 as a purported donation from him in exchange for (1) reviewing the files of his "attorney(s), past and present, and to assist * * * [him in] filing a 'writ of mandamus'" with the Supreme Court of the United States (Supreme Court) concerning Mr. Sigg's divorce and certain other civil matters and (2) preparing "possible contact letter to sue lawyers/judge/state of KS." Mr. Sigg wired $20,000 to petitioner's checking account on August 4, 2011. Petitioner had a prior history of accepting purported donations from Mr. Sigg and certain other individuals in exchange for services performed by Ms. Farr.

On September 9, 2011, Mr. Sigg filed, purportedly pro se, with the Supreme Court a document titled "PETITION FOR EXTRAORDINARY WRIT" (Mr. Sigg's petition). The question presented for Supreme Court review, as set forth in Mr. Sigg's petition, was whether Mr. Sigg was "deprived of due process of law in his divorce under the 5th Amendment to the United States Constitution due to his attorneys and the court engaging in abuse of discretion, fraud on the court and outrageous government conduct for over 10 years to deplete him and his son, Mitch, of their assets". Mr. Sigg's petition also stated in pertinent part:

**[*14]**     More frustrated than ever, John again sought help from the Association for Honest Attorneys (A.H.A.!) on August 4, 2011.  He told them that back in 2007, Attorneys Sevart and Mills had persuaded John and Mitch they could handle all of their legal matters up to the U.S. Supreme Court for $1 million, that Sevart had been paid almost all of this money, and that another $1 million had been illegally taken from their assets on a supercedeas bond on July 12, 2011.  He told the A.H.A.! that the Trial Court stated that the $7 million judgment against Mitch was now up to $9 million because "interest was being added."  On August 22, 2011, Mitch sent a letter intending to sue the lawyers, court and others in a federal suit alleging theft of his assets, and the A.H.A.! helped John prepare this petition for an extraordinary writ.

Ms. Farr continued in 2011 to provide in petitioner's name unauthorized legal assistance to certain individuals, including herself with respect to, inter alia, her challenges to the February 11, 2011 injunction and the fines imposed by the Sedgwick County district court against her for practicing law without a license, her arrest for hosting an underage drinking party, and a lawsuit filed against a local school district regarding her son.

Petitioner ceased sending newsletters via mail in January 2011.  During 2010, 2011, and 2012, petitioner maintained a website at www.assocforhonest-attys.com.  Information links on petitioner's website included topics such as "A.H.A.! News Update", "Lawyers to Avoid/Consider", "How to File a Federal Suit", and "Book Order/Membership".

**[\*15]** Petitioner's "News Update" for October 2011 included information that petitioner "helped Mr. Sigg file a writ of mandamus with the United States Supreme Court", and information regarding the attempted exhumation of the remains of Jack Farr and the results of that attempted exhumation.

A summary of petitioner's board meetings in 2011 (2011 board meeting summary) indicated that at the board meeting on April 28, 2011, the board discussed petitioner's news update for April 2011, which indicated that Ms. Farr "was falsely put in jail on 3/19/11 for 'hosting an underage drinking party' when her 16-yr old son had a party for spring break." The 2011 board meeting summary further indicated that at the board meeting on June 4, 2011, the board discussed "how govt officials continue to try and thwart the Medal of Honor Award for CEO's [Ms. Farr's] father".

Ms. Farr filed an appeal with the Court of Appeals for the State of Kansas (Kansas court of appeals) with respect to the rulings and findings of the Sedgwick County district court in the Kansas action against Ms. Farr for the unauthorized practice of law and the violation of certain Kansas consumer protection laws. The Kansas court of appeals issued an opinion on February 24, 2012, in which it, inter alia, sustained the February 10, 2011 injunction. In doing so, the Kansas court of appeals stated, inter alia:

**[\*16]** Heffington admitted that AHA helped prepare letters and documents, including petitions, on behalf of donors to the corporation. Heffington also admitted that she had gone to court with donors but only to offer personal advice, guidance, and emotional support.

\*      \*      \*      \*      \*      \*      \*

> K.S.A. 60-3601 states that a volunteer for a nonprofit corporation may be immune from liability under certain circumstances. But in order to be a volunteer, one must not "directly or indirectly" receive compensation for his or her services. Here, the [Sedgwick County] district court found that Heffington "accepted payment from consumers in connection with legal services" and that "[t]his payment was made in the form of a donation to [Heffington's] organization, ... in exchange for the services provided to consumers."

On February 3, 2015, respondent timely mailed a final adverse determination letter to petitioner (adverse determination letter). In that letter, respondent revoked, effective as of January 1, 2010, petitioner's tax-exempt status under section 501(a) because it no longer operated in accordance with section 501(c)(3). In the adverse determination letter, respondent explained the basis for respondent's revocation of petitioner's tax-exempt status under section 501(a) in pertinent part as follows:

> You have failed to demonstrate that you are operated exclusively for exempt purposes, and that no part of your net earnings inures to the benefit of private shareholders and individuals, as required by section 501(c)(3) of the Code. In addition, your activities more than insubstantially further non-exempt purposes, and you operate primarily for the benefit of private rather than public interests.

[*17] During 2010, 2011, and 2012, petitioner did not, through Ms. Farr or any-one else, engage primarily in the activities described in its articles of incorporation and its bylaws. During 2010, 2011, and 2012, the net earnings of petitioner inured to the benefit of Ms. Farr, its CEO/board president; petitioner operated primarily for the benefit of private rather than public interests; and more than an insubstan-tial part of petitioner's activities furthered nonexempt, private purposes.

## Discussion

Petitioner has the burden of establishing that the determinations in the adverse determination letter are erroneous. See Rule 142(a); Partners in Charity, Inc. v. Commissioner, 141 T.C. 151, 162 (2013). Before addressing whether petitioner has carried that burden, we shall set forth the legal principles that control whether to sustain respondent's determinations in the adverse determina-tion letter.

Section 501(a) exempts from tax organizations described in, inter alia, section 501(c)(3). As pertinent here, organizations described in section 501(c)(3) include

> Corporations * * * organized and operated exclusively for * * *
> charitable, * * * or educational purposes, * * * or for the prevention
> of cruelty to children * * * no part of the net earnings of which inures
> to the benefit of any private shareholder or individual, no substantial
> part of the activities of which is carrying on propaganda, or otherwise

[*18] attempting, to influence legislation (except as otherwise provided in subsection (h)) * * *.

An organization is organized exclusively for one or more purposes specified in section 501(c)(3) only if its articles of organization (articles) (1) limit the purpose of such organization to one or more purposes specified in that section and (2) do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities that in themselves are not in furtherance of one or more of those purposes. See sec. 1.501(c)(3)-1(b)(1)(i), Income Tax Regs.

An organization will be treated as operated exclusively for one or more purposes specified in section 501(c)(3) only if it engages primarily in activities that accomplish one or more of those purposes. An organization will not be regarded as operated exclusively for one or more purposes specified in section 501(c)(3) if more than an insubstantial part of its activities is not in furtherance of one or more of those purposes. See sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.

As pertinent here, an organization generally may be exempt from tax as an organization described in section 501(c)(3) if it is organized and operated exclusively for charitable[4] or educational purposes. See sec. 1.501(c)(3)-(d)(1)(I),

---

[4]The term "charitable" in sec. 501(c)(3) is used in its generally accepted

(continued...)

**[\*19]** Income Tax Regs.  An organization is not organized or operated exclusively for charitable or educational purposes unless it serves the public rather than a private interest.  In other words, in order to be organized and operated exclusively for charitable or educational purposes specified in section 501(c)(3), an organization must establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or the creator's family, or persons controlled, directly or indirectly, by such private interests.  See sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.

The term "educational" in section 501(c)(3) relates to the instruction or training of the individual for the purpose of improving or developing the individual's capabilities or the instruction of the public on subjects useful to the individual and beneficial to the community.  See sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs.  An organization may be educational even though it advocates a particular position or viewpoint so long as it presents sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent

---

[4](...continued)
legal sense.  Therefore, that term is not to be construed as limited by the separate enumeration in that section of other purposes that may fall within the broad outlines of "charity" as developed by judicial decisions.  See sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.  As pertinent here, the term "charitable" in sec. 501(c)(3) includes the advancement of education.

**[\*20]** opinion or conclusion. <u>Id.</u> However, an organization is not educational if its principal function is the mere presentation of unsupported opinion. <u>See</u> <u>id.</u>

An organization may meet the requirements of section 501(c)(3) only if it serves the public rather than a private interest. <u>See</u> sec. 1.501(c)(3)-1(d)(5)(i), Income Tax Regs. The presence of a single substantial purpose that is not described in section 501(c)(3) precludes exemption from tax under section 501(a) regardless of the number or the importance of the purposes that are present and that are described in section 501(c)(3). <u>See</u> <u>Better Bus. Bureau v. United States</u>, 326 U.S. 279, 283 (1945); <u>Copyright Clearance Ctr., Inc. v. Commissioner</u>, 79 T.C. 793, 804 (1982).

The determination of (1) an organization's purposes and (2) the purposes the organization's activities support are questions of fact. <u>See</u> <u>Pulpit Res. v. Commissioner</u>, 70 T.C. 594 (1978). In reviewing the administrative record in proceedings under section 7428(a), the Court may draw factual inferences from the entire administrative record. <u>See</u> <u>Natl. Ass'n of Am. Churches v. Commissioner</u>, 82 T.C. 18, 20 (1984). In order to determine whether the purposes of an organization are described in section 501(c)(3), it is necessary to examine the actual purposes that the organization's activities are intended to accomplish, and not only the nature of the activities of the organization or its statement of purpose.

**[*21]** <u>See</u> <u>Living Faith, Inc. v. Commissioner</u>, 950 F.2d 365, 370 (7th Cir. 1991), aff'g T.C. Memo. 1990-484; <u>Am. Campaign Acad. v. Commissioner</u>, 92 T.C. 1053, 1064 (1989).

If an organization is engaged in a single activity directed at achieving various purposes, some of which are described in section 501(c)(3) and some of which are not described in that section, the organization will fail the operational test where the purpose not described in that section is more than insubstantial. <u>See</u> <u>Redlands Surgical Servs. v. Commissioner</u>, 113 T.C. 47, 71 (1999), <u>aff'd</u>, 242 F.3d 904 (9th Cir. 2001).

In determining whether an organization complies with the operational test of section 501(c)(3), it is necessary to look beyond the organization's articles in order to ascertain "the actual objects motivating the organization and the subsequent conduct of the organization." <u>See</u> <u>Taxation With Representation v. United States</u>, 585 F.2d 1219, 1222 (4th Cir. 1978) (quoting <u>Samuel Friedland Found. v. United States</u>, 144 F. Supp. 74, 85 (D.N.J. 1956)); <u>see also</u> <u>Christian Manner Intl., Inc. v. Commissioner</u>, 71 T.C. 661, 668 (1979).

We shall now consider whether petitioner has carried its burden of establishing that the determinations in the adverse determination letter are erroneous. We summarized in the background section of this Memorandum Opinion certain

[*22] salient facts in the record before us, virtually all of which consists of the administrative record and the amended administrative record.[5] On that record, we found that during 2010, 2011, and 2012 petitioner did not, through Ms. Farr or anyone else, engage primarily in the activities described in its articles of incorporation and its bylaws. We also found that during 2010, 2011, and 2012 the net earnings of petitioner inured to the benefit of Ms. Farr, its CEO/board president; petitioner operated primarily for the benefit of private rather than public interests; and more than an insubstantial part of petitioner's activities furthered nonexempt, private purposes.

Based upon our examination of the entire record before us, we find that petitioner has failed to carry its burden of establishing error in respondent's determination in the adverse determination letter that, effective as of January 1, 2010, petitioner no longer operated in accordance with section 501(c)(3). On that record, we further find that petitioner has failed to carry its burden of establishing that respondent erred in determining in the adverse determination letter to revoke, effective as of January 1, 2010, petitioner's status as an organization exempt from tax under section 501(a). On the record before us, we sustain respondent's deter-

_____

[5]See supra note 2. In addition, as noted above, the only difference between the administrative record and the amended administrative record is that the former is not paginated and the latter is paginated.

**[*23]** minations in the adverse determination letter to revoke, effective as of January 1, 2010, petitioner's tax-exempt status under section 501(a) because, effective as of that date, it no longer operated in accordance with section 501(c)(3).

We have considered all of the contentions and arguments of petitioner that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.