# United States Tax Court

T.C. Memo. 2026-1

MILK SAVING STARVING CHILDREN FOUNDATION,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 13274-22X.                    Filed January 6, 2026.

————

Kimberly Orazzi (an officer), for petitioner.

*Mary Michelle M. McCarthy*, *Erika B. Cormier*, and *Marie E. Small*, for respondent.

## MEMORANDUM OPINION

LEYDEN, *Special Trial Judge*: This case is before the Court on respondent's Motion for Summary Judgment (Motion) filed February 20, 2024. After examining petitioner's activities for the taxable year ended June 30, 2018, the Internal Revenue Service (IRS)[1] issued a Final Adverse Determination Letter dated February 25, 2022, revoking petitioner's exemption from federal income tax under section 501(a)[2] as an organization described in section 501(c)(3), effective July 1, 2017.

---

[1] The Court uses the term "IRS" to refer to administrative actions taken outside of these proceedings. The Court uses the term "respondent" to refer to the Commissioner of Internal Revenue, who is the head of the IRS and is respondent in this case, and to actions taken in connection with this case.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*2]**  On May 26, 2022, petitioner timely filed a Petition for a declaratory judgment challenging the IRS's determination. *See* I.R.C. § 7428(a)(1)(A), (b)(3).  On February 20, 2024, respondent filed the Motion moving the Court for summary adjudication in respondent's favor upon all issues presented.  By Order served February 21, 2024, the Court directed petitioner to respond to the Motion.  On June 11, 2024, petitioner filed a Letter with the Court.  The Court characterized petitioner's June 11, 2024, Letter as a Motion for Extension of Time to respond to the Motion, granted it, and gave petitioner until August 5, 2024, to file a response to respondent's Motion.  However, petitioner did not file any further response or objection to the Motion.

For the reasons discussed below, the Court concludes that there are not any genuine issues of material fact, and respondent is entitled to judgment as a matter of law.

*Background*

Petitioner is a Pennsylvania Domestic Nonprofit Corporation, and its principal place of business was in the Commonwealth of Pennsylvania when the Petition was filed.

On August 15, 2023, respondent filed the Administrative Record, appropriately certified as to its genuineness pursuant to Rule 217(b).  Petitioner has not filed any motion contesting the completeness of Administrative Record.  The following facts are drawn from the parties' pleadings and the Administrative Record.  *See* Rules 121(c), 217(b)(1).  They are stated solely for the purpose of deciding respondent's Motion and not as findings of fact in this case.  *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

I.  *Petitioner's Application for Recognition of Exemption Under Section 501(a)*

Petitioner was incorporated on June 9, 2001, under the laws of the Commonwealth of Pennsylvania, and it filed Articles of Incorporation on June 18, 2001.  Petitioner's sole incorporator was Eugene Daniel Lucas.

Subsequently, petitioner submitted to the IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code (Application), dated September 14, 2001.  The IRS received it on December 5, 2001.  In its Application, petitioner described its planned activities as follows:

[*3]  The Milk Saving Starving Children Foundation will raise money to purchase rice, soy, and/or powdered milk. It will solicit these products from their manufacturers. The milk will then be distributed world-wide to starving children.

Petitioner stated in its Application that it had shipped $159.60 worth of powdered milk to Ecuador and Haiti in 2001. It also projected that it would receive contributions for 2002 and 2003 of $1,200 and $1,500, respectively, and that for each of those years it would make "contributions, gifts, grants, and similar amounts paid" of $1,100 and $1,400, respectively.

On January 28, 2002, petitioner executed Articles of Amendment-Domestic Nonprofit Corporation to amend its Articles of Incorporation by adding the following three additional paragraphs "[a]s a part of [its] application for recognition of exemption from federal income tax."

a.    The organization is organized exclusively for charitable, religious, educational, and/or scientific purposes under section 501(c)(3) of the Internal Revenue Code.

b.    No part of the net earnings of the organization shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the organization shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in the purpose clause hereof. No substantial part of the activities of the organization shall be carrying on propaganda, or otherwise attempting to influence legislation, and the organization shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this document, the organization shall not carry on any other activities not permitted to be carried on (a) by an organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or (b) by an organization, contributions of which are deductible under section 170(c)(2) of the Internal Revenue

**[\*4]**   Code, or corresponding section of any future federal tax code.

c.      Upon the dissolution of the organization, assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for public purpose.

In February 2002 the IRS sent petitioner a letter stating that it would be treated as exempt from federal income tax under section 501(c)(3) and that it would be treated as a public charity, rather than a private foundation during an advance ruling period. On March 29, 2006, the IRS classified petitioner as a public charity under section 170(b)(1)(A)(vi) and exempt from federal income tax under section 501(c)(3).

## II.     *Petitioner's Activities Before Examination*

### A.     *Purchase, Renovation, and Leasing of Real Property*

Around November 15, 2001, after the date on its Application, petitioner's board of directors approved a plan to purchase and renovate a building (Property) and operate a coffee shop. On June 3, 2002, a coffee shop, Café Beignet, was created. On July 15, 2002, petitioner purchased the Property for $90,000. Café Beignet opened at the Property in November 2003. In 2005 petitioner began planning an addition to the Property, which was completed around September 7, 2009. In the subsequent decade petitioner rented the Property to various tenants, including two pizza shops and an Indian restaurant.

### B.     *Operation of a Coffee Shop*

Petitioner has operated Café Beignet since November 2003 selling beignets, as well as coffee, tea, and soft drinks. It also has tables and chairs for its customers. It is a cash only business. Petitioner did not reference the operation of Café Beignet in its Application.

### C.     *Milk Donations*

Petitioner donated $159.60 worth of powdered milk in 2001 to Haiti and Ecuador. In a meeting on September 1, 2008, petitioner's

[*5] board of directors discussed "local milk shipments." The record does not define "local milk shipments." Petitioner reported on its 2008 tax return that it spent $1,100 on milk donations. In 2011 petitioner's powdered milk donations ceased.

However, sometime during 2020, after the IRS began its examination for petitioner's 2018 tax year,[3] petitioner made some shipments of powdered milk to various aid organizations that would distribute the powdered milk in Mexico, Haiti, Peru, or local community shelters in Scranton, Pennsylvania. The record does not indicate the quantity or frequency of the shipments.

D.    *Golf Fundraiser*

On September 6, 2010, one of petitioner's officers, a former director, suggested at a board of directors meeting that petitioner start an annual golf fundraiser to be held in September or October each year. Sometime after that petitioner held annual golf fundraisers, but it is unclear from the record how petitioner used any funds it raised from the fundraisers.

E.    *Petitioner's Filed Tax Returns*

Petitioner filed tax returns for tax years 2008 through 2021 except for 2017. On its returns it listed three principals: Kimberly Orazzi (who represents petitioner in the present case), David Silvestrini, and Eugene Daniel Lucas. For tax year 2008 petitioner filed Form 990, Return of Organization Exempt From Income Tax, reporting that it was doing business as Café Beignet. The exempt purpose identified in the 2008 return was to provide "vitamin-fortified powdered milk to children locally and around the world."

For each of tax years 2009, 2010, 2012, and 2015, petitioner filed Form 990–EZ, Short Form Return of Organization Exempt From Income Tax, which requires reporting limited financial and operational information. In its 2009 tax return petitioner stated that its primary exempt purpose was to "distribute vitamin-fortified powdered milk." This exempt purpose was not reported in petitioner's tax returns for 2010, 2012, and 2015 or in the attachments to those returns. In fact, the section for the organization's primary exempt purpose was left blank on those returns. On its Form 990–EZ for tax year 2015 petitioner was required to report its financials for 2015 and the four preceding years.

_____
[3] Petitioner's tax year is a fiscal year beginning July 1 and ending June 30.

[*6] However, on that return petitioner did not report any contributions or revenue from gross sales less cost of goods sold. Further, on that 2015 tax return petitioner did not report any expenses except for Ms. Orazzi's salary, nor did petitioner report receiving any contributions for that tax year or the four preceding tax years.[4] Nor was there any indication that petitioner incurred expenses from charitable giving in 2015. The tax return filed for tax year 2015 is the last tax return petitioner filed in which it was required to report such information.

For tax years 2011, 2013, 2014, 2016, and 2018 through 2021, petitioner filed Form 990–N, Electronic Notice (e-Postcard) for Tax-Exempt Organizations Not Required to File Form 990, which does not require taxpayers to report financial or operational information, other than a representation that the taxpayer's gross receipts were not greater than $50,000. The only other information required on Form 990–N is the organization's name, mailing address, principal officer's name and address, and a representation that the organization has not been terminated. For tax years 2010, 2012, and 2015, petitioner also filed Forms 990–N, despite filing Forms 990–EZ for those years.

III.    *Examination for Tax Year 2018*

On September 26, 2019, an IRS revenue agent informed petitioner by letter that it had been selected for audit with respect to its 2018 tax year. The revenue agent scheduled an initial interview and onsite visit. In the letter the revenue agent also enclosed an Information Document Request (IDR) requesting background documents and financial information needed to conduct the audit.

On November 4, 2019, the revenue agent conducted an onsite visit at the Property, as well as an interview with Ms. Orazzi, petitioner's secretary and principal contact. Ms. Orazzi, who was employed by Mr. Lucas' law firm, also worked at Café Beignet. During the initial interview between the revenue agent and Ms. Orazzi, she stated that petitioner's mission had changed from distributing powdered milk, but she did not elaborate.

On November 7, 2019, the revenue agent reviewed petitioner's financials for tax year 2018, including cash receipts, expenses, and bank statements. The revenue agent also reviewed the lease for the addition

---

[4] This conflicts with information reported on petitioner's 2012 Form 990–EZ, which included financial information for contributions and expenses for tax years 2011 and 2012 that petitioner did not include on its 2015 tax return.

[*7] to the Property, which was then being rented out for $500 per month.  The tenant (a pizzeria) was responsible for maintenance and utilities.  Petitioner's books and records indicated that the rental income from the addition to the Property was directly deposited in a bank to pay off a loan that petitioner had obtained and that was secured by the Property.

After the revenue agent's initial interview and a review of petitioner's books and records, the revenue agent sent on December 19, 2019, and April 7, 2021, 11 more IDRs to petitioner requesting additional information and documentation as well as clarification of Ms. Orazzi's statements made during the initial interview.

Ms. Orazzi responded to the IDRs, and in response to one request she acknowledged that petitioner had not conducted charitable powdered milk distribution during the 2018 tax year, nor had it done so for several prior years.  She wrote that "[t]he foundation was established to provide vitamin fortified powdered milk to starving children around the world.  The want for this decreased after 2011."  However, Ms. Orazzi also indicated that petitioner was engaged in other charitable activities which she identified as running a charity golf tournament, selling baked goods at Café Beignet, donating proceeds and baked goods to other charities, and purchasing items from other charities or donating to other charities.  Ms. Orazzi later sent the revenue agent a fax informing him that during the 2020 calendar year petitioner held several fundraisers, and it planned to hold its fundraiser golf tournament in September of that year.

In response to that fax the revenue agent sent additional IDRs to petitioner.  In the IDRs the revenue agent noted that petitioner's primary sources of income were rent and the annual golf fundraiser proceeds.

The revenue agent's review of petitioner's tax year 2018 books and records revealed petitioner's income and expenses as follows:

| Income | Amount |
| --- | --- |
| Café Sales | $1,697 |
| Rental Income | 6,000 |
| Golf Fundraiser | 13,100 |
| Donations | 5,650 |
| **Total** | $26,447 |

| [*8]          *Expenses* | *Amount* |
|--------------------------|---------:|
| Sales Tax | $50 |
| Golf Tournament Expenses | 2,063 |
| Salaries | 3,900 |
| Baking Supplies | 876 |
| Phone | 264 |
| Insurance | 1,500 |
| Loans to Mr. Lucas | 9,090[5] |
| Mortgage | 6,000 |
| A/C Unit Repairs | 2,354 |
| **Total** | $26,097 |

None of petitioner's expenses in tax year 2018 were for rice, soy, or powdered milk.

On April 7, 2021, the revenue agent sent another IDR to petitioner to request "[a] trial balance or other accounting record that accurately and completely reports you[r] assets, liabilities, revenues, expenses and equity for the fiscal year ending June 30, 2018." Petitioner did not respond to that IDR or otherwise send the revenue agent the requested information.

On June 8, 2021, the revenue agent sent petitioner a proposed adverse determination letter, which explained why the IRS was proposing to revoke petitioner's tax-exempt status. The letter concluded in relevant part as follows:

> [Petitioner] is no longer fulfilling its exempt purpose . . . .
> [Petitioner] ceased milk distribution activities over the last several years. It recently began distributing milk in response to the potential revocation. . . . Its primary activity, operating a café to raise funds is neither charitable nor educational. Its primary sources of revenue are from renting its building addition and its golf fundraiser. Both activities were performed to raise funds none of which were used for charitable purposes as

---

[5] This includes $4,572.15 to pay off the People's Security Loan and $1,462.16 for a "Sales Tax Issue."

**[\*9]** demonstrated by the table of revenue and expenses displayed above.

The revenue agent and two of petitioner's representatives, Ms. Orazzi and Mr. Lucas, continued communicating after the IRS sent the proposed adverse determination letter. In a letter dated August 6, 2021, petitioner's representatives stated that petitioner had been active and had placed orders for several pounds of powdered milk, including several orders that were canceled because the powdered milk was out of stock. They provided the revenue agent with receipts, which included successful purchases of powdered milk from Amazon on November 4, 2020, of $74.78, November 4, 2020, of $50.62, and January 8, 2021, of $50.50. The address on the receipts was that of Café Beignet.

In response to that letter, the revenue agent called petitioner's representatives and requested current financial documentation for January 1, 2020, through June 30, 2021, to show that petitioner was expending funds for its exempt function. Petitioner did not provide the requested information to the revenue agent.

Subsequently, on February 25, 2022, the IRS issued petitioner a final adverse determination letter, revoking petitioner's section 501(c)(3) tax-exempt status effective July 1, 2017. In response petitioner timely filed its Petition on May 26, 2022, for a declaratory judgment, disagreeing with the IRS's adverse determination.

## Discussion

### I. Scope and Standard of Review

Section 7428(a)(1)(A) confers jurisdiction on the Court to make a declaration in a case of actual controversy involving a determination by the Commissioner with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a). An action for declaratory judgment may be decided by summary judgment. Rules 121, 217(b)(2); *see, e.g.*, *Church in Bos. v. Commissioner*, 71 T.C. 102, 105 (1978); *Sol. Plus, Inc. v. Commissioner*, T.C. Memo. 2008-21, 2008 WL 312764, at \*6.

The scope of the Court's review is limited to the administrative record pursuant to Rule 217(a). The petitioner bears the burden of establishing that the Commissioner's determination is erroneous. Rule 142(a); *Partners in Charity, Inc. v. Commissioner*, 141 T.C. 151, 162

**[\*10]** (2013). The scope of the Court's inquiry is "limited to the propriety of the reasons given by the Commissioner for denying an organization's application for exemption," rather than a de novo review of the administrative record. *IHC Health Plans, Inc. v. Commissioner*, T.C. Memo. 2001-246, 2001 WL 1103284, at \*11, *aff'd*, 325 F.3d 1188 (10th Cir. 2003).

Respondent filed the Administrative Record, appropriately certified as to its genuineness pursuant to Rule 217(b)(1), as defined by Rule 210(b)(12), which petitioner has not contested. Accordingly, the evidence the Court will consider consists solely of the Administrative Record. *See* Rule 217(b)(1).

II.    *Summary Judgment*

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). Either party may move for summary judgment upon all or any part of the legal issues in controversy. Rule 121(a)(1). The Court may grant summary judgment only if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 121(a)(2).

Respondent, as the moving party, bears the burden of proving that no genuine dispute exists as to any material fact and that respondent is entitled to judgment as a matter of law. *See FPL Grp., Inc. & Subs. v. Commissioner*, 115 T.C. 554, 559 (2000); *Bond v. Commissioner*, 100 T.C. 32, 36 (1993); *Naftel v. Commissioner*, 85 T.C. 527, 529 (1985). In deciding whether to grant summary judgment, the factual materials and inferences drawn from them must be considered in the light most favorable to the nonmoving party. *FPL Grp., Inc.*, 115 T.C. at 559; *Bond*, 100 T.C. at 36; *Naftel*, 85 T.C. at 529. The party opposing summary judgment must set forth specific facts which show that a question of genuine material fact exists and may not rely merely on allegations or denials in the pleadings. Rule 121(d); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Grant Creek Water Works, Ltd. v. Commissioner*, 91 T.C. 322, 325 (1988); *King v. Commissioner*, 87 T.C. 1213, 1217 (1986).

III.    *Section 501(c)(3) Tax-Exempt Status*

The flush text of section 7428(a) provides in pertinent part that "a determination with respect to a continuing qualification . . . includes any revocation of or other change in a qualification."

**[\*11]**  A.  *General Rules Regarding Exempt Status*

Section 501(a) exempts from federal income taxation organizations described in section 501(c).  Among the organizations so described are those set forth in section 501(c)(3), which are:

> [c]orporations . . . organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition . . . , or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual . . . .

In order to be exempt under section 501(c)(3), an organization must be both organized exclusively for one or more of the exempt purposes specified in the section, known as the organizational test, and operated exclusively for such purposes, known as the operational test. *See* Treas. Reg. § 1.501(c)(3)-1(a)(1).  Failure to satisfy either test forecloses a section 501(c)(3) exemption.  Treas. Reg. § 1.501(c)(3)-1(a)(1).  In the instant case the IRS's basis for revoking petitioner's exempt status is its determination that petitioner was not organized and operated exclusively for an exempt purpose.  However, respondent's Motion focuses on petitioner's failure of the operational test.[6]

B.  *Failure of the Operational Test*

In the application of the operational test, "exclusively" does not mean "solely" or "absolutely without exception." *Nationalist Movement v. Commissioner*, 102 T.C. 558, 576 (1994) (quoting *Church in Bos.*, 71 T.C. at 107), *aff'd per curiam*, 37 F.3d 216 (5th Cir. 1994); *see also Copyright Clearance Ctr., Inc. v. Commissioner*, 79 T.C. 793, 803–04 (1982).  Nonetheless, the presence of a single nonexempt purpose, if substantial, precludes exempt status regardless of the number or importance of truly exempt purposes. *Better Bus. Bureau of Wash., D.C., Inc. v. United States*, 326 U.S. 279, 283 (1945); *Redlands Surgical Servs. v. Commissioner*, 113 T.C. 47, 71–72 (1999), *aff'd per curiam*, 242 F.3d 904 (9th Cir. 2001); *Nationalist Movement*, 102 T.C. at 576; *Am. Campaign Acad. v. Commissioner*, 92 T.C. 1053, 1065 (1989).

---

[6] Further, petitioner did not file a response to the Motion and has not challenged the revocation as to the organizational test.

[*12] With respect to the operational test:

> An organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

Treas. Reg. § 1.501(c)(3)-1(c)(1).

The operational test also reinforces the express dictates of section 501(c)(3) in that an entity is deemed not to operate exclusively for exempt purposes if net earnings are distributed or otherwise inure to the benefit of private individuals. Treas. Reg. § 1.501(c)(3)-1(c)(2). Additionally, although an organization may be engaged in only a single activity directed toward multiple purposes, both exempt and nonexempt, failure to satisfy the operational test will result if any nonexempt purpose is substantial. *Redlands Surgical Servs.*, 113 T.C. at 71; *Copyright Clearance Ctr.*, 79 T.C. at 803–04.

The IRS determined that petitioner did not operate exclusively for exempt purposes. In the determination letter, the IRS concluded that petitioner was "no longer fulfilling its exempt purpose" because it "ceased milk distribution activities over the last several years." The letter further noted that petitioner only "recently began distributing milk in response to the potential revocation." The IRS found that petitioner's primary activity was operating a coffee shop, Café Beignet, and petitioner's primary sources of revenue were from renting the Property and its addition, as well as its golf fundraiser. The IRS concluded that the funds raised by the above activities were not used for charitable purposes, as demonstrated by petitioner's tax returns and financial documentation.

In this regard the presence of a single substantial purpose that is not described in section 501(c)(3) precludes exemption from tax under section 501(a) regardless of the number or the importance of the purposes that are present and described in section 501(c)(3). *See Better Bus. Bureau*, 326 U.S. at 283.

"Under the operational test, the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be

**[\*13]** classified as a section 501(c)(3) organization exempt from tax under section 501(a)." *B.S.W. Grp., Inc. v. Commissioner*, 70 T.C. 352, 356–57 (1978). As the Court has noted, "[e]ven in a commercial, profit-motivated context, such activities may be wholesome and commendable; but they will not support tax-exempt status unless they are undertaken to further an exempt purpose." *Partners in Charity, Inc.*, 141 T.C. at 164.

C.     *Petitioner's Lack of Objections to Summary Judgment*

Rule 121(d) sets forth that "[t]he nonmovant must respond, setting forth specific facts . . . to show that there is a genuine dispute of fact for trial." Further, "any response in opposition to a motion for summary judgment must include a statement of facts with references to the administrative record." Rule 121(j). Where a party fails to properly address an assertion of fact, the Court may (1) "consider the fact undisputed for purposes of the motion" and (2) "grant summary judgment if the motion and supporting materials (including the facts considered undisputed) show that the movant is entitled to it." Rule 121(f). "Disputes over facts that are not outcome determinative do not preclude the entry of summary judgment." *Carpenter v. Commissioner*, T.C. Memo. 2012-1, 2012 WL 10798, at \*4 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *supplemented by* T.C. Memo. 2013-172.

Despite the Court's directing petitioner to file an objection to respondent's Motion, petitioner did not do so. Petitioner has not offered anything in opposition to respondent's conclusion that petitioner did not operate exclusively for exempt purposes other than in the Petition, in which petitioner asserted that "[t]he Milk Saving Starving Children foundation has received substantial contributions to show it is in compliance with the requirements of being 501(c)(3) charitable foundation (sic)," and that "[t]he Milk Saving Starving Children foundation is in compliance with being a 501(c) charitable foundation as it is a publicly (sic) supported organization." While the record does support that petitioner received contributions, it does not show that petitioner dispensed those contributions in support of its exempt purpose. For tax year 2018 petitioner's books and records show that it did not make any payments or donations in support of its exempt purpose, despite receiving income of $26,447. Petitioner claimed to donate to other charitable causes throughout the course of its operation, but the record does not support this claim, and in tax year 2018 it reported no such donations.

**[*14]** The Administrative Record shows that, as respondent argued in his Motion, while petitioner may have donated and participated in some charitable endeavors, it was not operated exclusively for exempt purposes. In addition to any charitable activities it undertook, petitioner engaged extensively, and seemingly primarily, in commercial activities, namely (1) purchasing and renovating the Property, as well as renting out the addition to that Property to unrelated commercial businesses, and (2) using the Property to operate a coffee shop, Café Beignet. Petitioner has not argued or demonstrated that its operation of its commercial activities furthered its exempt purposes. Accordingly, by operating these commercial activities not in furtherance of its exempt purpose, petitioner is disqualified from its tax-exempt status under the above-referenced operational test.

IV. *Conclusion*

Petitioner has failed to adequately respond to respondent's Motion, and the Court could enter a decision against it for that reason alone. *See* Rule 121(d). However, the Court has considered respondent's Motion on its merits. A review of the Administrative Record shows that petitioner did not operate exclusively for one or more exempt purposes within the meaning of section 501(c)(3). Because the Court finds that petitioner failed the operational test, it need not address whether petitioner was organized for a charitable purpose. Petitioner has not met its burden of proving that respondent's determination to revoke its tax-exempt status effective July 1, 2017, was erroneous.

Accordingly, for the reasons set forth above, the Court concludes that respondent is entitled to summary judgment as a matter of law.

To reflect the foregoing,

*An appropriate order and decision will be entered.*